DONALD J. TRUMP, Petitioner, *v.* THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and for the County of Clark, and THE HONORABLE NANCY A. BECKER, District Judge, Respondents, and GNLV CORP., a Nevada Corporation, Real Party in Interest.

No. 23912

July 27, 1993                                    857 P.2d 740

*Donald J. Campbell & Associates,* Las Vegas, for Petitioner.

*Galane, Tanksley, Rickdall & Ballif,* Las Vegas, for Real Party in Interest.

# OPINION

*Per Curiam:*

While Dennis Gomes (Gomes) was acting, pursuant to an employment contract, as president and chief executive officer (CEO) of the Golden Nugget Hotel and Casino (Golden Nugget) in Las Vegas, owned by real party in interest GNLV Corp. (GNLV), Trump Taj Mahal Associates[1] entered into a conflicting employment contract with Gomes to employ him as the president and chief operating officer (COO) of the Trump Taj Mahal Casino Resort (the Taj Mahal). Part of Gomes' employment contract with Trump Taj Mahal Associates included the creation of a Nevada trust for Gomes, run by a Nevada trustee and containing a

---

[1]Trump Taj Mahal Corporation is a Delaware corporation and a corporate general partner which owns a 0.01% interest in Trump Taj Mahal Associates. Trump Taj Mahal, Inc., is a New Jersey corporation and a corporate general partner which owns a 99.99% interest in Trump Taj Mahal Associates. Trump Taj Mahal Associates is a New Jersey general partnership doing business as Trump Taj Mahal Casino Resort in Atlantic City, New Jersey. Trump is the sole shareholder and sole director of Trump Taj Mahal Corporation and Trump Taj Mahal, Inc., and beneficially owns 100% of Trump Taj Mahal Associates. Trump also serves as a member of the Trump Taj Mahal Casino Resort Executive Committee.

Nevada choice-of-law clause. GNLV brought suit in the Eighth Judicial District Court of Nevada against petitioner Donald J. Trump (Trump) individually for intentional interference with contractual relations, and GNLV subsequently served Trump with the complaint in New York. Trump moved to quash service of process, claiming that the Nevada district court did not have personal jurisdiction over him. The district court denied Trump's motion. We conclude that the district court did not err in exercising personal jurisdiction over Trump, and we therefore deny this petition for a writ of prohibition.

## FACTS

On January 25, 1989, Gomes entered into a contract to become the president and CEO of the Golden Nugget, owned and operated by GNLV. The Chairman of the Board of GNLV, and Gomes' immediate supervisor at the Golden Nugget, was Stephen Wynn (Wynn), with whom Trump had shared a mutual animosity. The term of Gomes' employment was to be from April 10, 1989, to April 9, 1992. In January, 1991, Kevin DeSanctis (DeSanctis), Gomes' longtime friend, was hired by Nick Ribis (Ribis), the CEO of the Taj Mahal and of all Trump-related gaming properties in Atlantic City, to become president of the Trump Plaza Hotel & Casino (Trump Plaza) in Atlantic City.

At the time suit was brought, Trump was the sole shareholder and sole director of two corporations, Trump Taj Mahal Corporation and Trump Taj Mahal, Inc., which were the general partners of Trump Taj Mahal Associates, which owned the Taj Mahal in Atlantic City. In early 1991, after obtaining Trump's authorization, Ribis began negotiations with Gomes for Gomes to assume a position with one of the Trump properties. Gomes negotiated almost exclusively with Ribis, not with Trump. Eventually, Ribis offered Gomes the position of president and COO of the Taj Mahal. On February 15, 1991, Gomes flew to Florida to meet Trump and Ribis at Trump's Florida home to resolve the final details of Gomes' employment contract. Gomes spoke to Trump only briefly about Gomes' future employment with the Taj Mahal, the conversation relating to certain elements of Gomes' compensation package. The following day, Gomes left Trump's home and flew to Atlantic City to view the Taj Mahal operation.

In negotiating the terms of Gomes' employment, Gomes was furnished with a copy of DeSanctis' contract with the Trump Plaza, and this was used as the foundation for Gomes' contract. The DeSanctis draft was altered in numerous ways to reflect Gomes' needs, and drafts of Gomes' proposed contract were sent back and forth between Ribis in New York and New Jersey and

Gomes and his brother, a Nevada attorney, in Las Vegas. Ribis also telephoned Gomes and Gomes' brother in Las Vegas on several occasions. On March 18, 1991, an employment contract with the Taj Mahal, signed by both Gomes and Trump, was entered into.

During the contract negotiations, Gomes had expressed concern over publicity that Trump was incurring financial difficulties, and therefore Gomes sought some assurance that he would be paid even if Trump filed bankruptcy. As a result, Gomes' employment contract included the execution of a corresponding irrevocable trust for the benefit of Gomes, which guaranteed that Gomes would receive his base annual salary and an annual bonus in keeping with the employment contract. The trust was established through First Interstate Bank of Nevada (First Interstate) in Las Vegas, which was the trustee. "DONALD J. TRUMP, as General Partner of TRUMP'S TAJ MAHAL & ASSOCIATES" was the settlor. The trust provided that the validity, construction, and administration of the trust was to be governed by Nevada law. Before Trump signed the trust document, officers of First Interstate in Las Vegas reviewed the document and approved it. On March 13, 1991, Ribis directed the chief financial officer (CFO) of the Taj Mahal to authorize conditional wire transfers from New Jersey to First Interstate in Nevada of $350,000 for the account of Gomes and $650,000 for the account of the Gomes irrevocable trust, and the wire transfers were made on March 14, 1991. Two officers of First Interstate signed the trust in Las Vegas on March 20, 1991, after it was signed by Trump in New York on March 18, 1991, and forwarded to Nevada.

On March 13, 1991, Gomes formally tendered his resignation, effective April 12, 1991, to the Golden Nugget. On March 21, 1991, GNLV filed a complaint against Trump, Trump Taj Mahal Corporation, Trump Taj Mahal, Inc., Trump Taj Mahal Associates, and Gomes, alleging, inter alia, that Trump and his business interests tortiously induced Gomes to breach his employment contract with GNLV. Trump was served with the complaint in New York on April 9, 1991. GNLV voluntarily dismissed its complaint against Trump Taj Mahal Corporation, Trump Taj Mahal, Inc., and Trump Taj Mahal Associates, leaving only the individuals of Trump and Gomes in the suit. On April 29, 1991, Trump specially appeared and moved the district court to quash service of process against him on the grounds that he did not have sufficient personal contacts with Nevada such that the exercise of personal jurisdiction over him would not violate his constitutional due process rights. On April 30, 1991, GNLV moved for permission to conduct jurisdictional fact discovery.

A non-evidentiary hearing was held on the personal jurisdiction issue on November 4, 1992, at which time the district court announced its decision denying Trump's motion to quash service of process. The district court's written order denying the motion was filed on December 22, 1992, and the district court ordered Trump to file an answer to GNLV's complaint within twenty days. On January 4, 1993, Trump filed with this court his petition for a writ of prohibition restraining the district court from exercising personal jurisdiction over him in this matter. On January 7, 1993, this court ordered a stay of all district court proceedings pending this court's decision on the petition.

## DISCUSSION

### Standard of Review

A writ of prohibition is the appropriate remedy for a district court's erroneous refusal to quash service of process. Budget Rent-A-Car v. District Court, 108 Nev. 483, 484, 835 P.2d 17, 18 (1992); Price and Sons v. District Court, 108 Nev. 387, 390-91, 831 P.2d 600, 602 (1992).

Once a defendant challenges personal jurisdiction, the plaintiff may proceed to show jurisdiction by one of two distinct processes. In the more frequently utilized process, a plaintiff may make a prima facie showing of personal jurisdiction prior to trial and then prove jurisdiction by a preponderance of the evidence at trial. "When a challenge to personal jurisdiction is made, the plaintiff has the burden of introducing competent evidence of essential facts which establish a prima facie showing that personal jurisdiction exists." Abbott-Interfast v. District Court, 107 Nev. 871, 873, 821 P.2d 1043, 1044 (1991); see Levinson v. District Court, 103 Nev. 404, 406, 742 P.2d 1024, 1025 (1987); Davis v. District Court, 97 Nev. 332, 337, 629 P.2d 1209, 1213 (1981); see also Doe v. National Medical Services, 974 F.2d 143, 145 (10th Cir. 1992); Morrow v. New Moon Homes, Inc., 548 P.2d 279, 294 (Alaska 1976); MBM Fisheries v. Bollinger Mach. Shop, 804 P.2d 627, 630 (Wash.Ct.App. 1991).

The plaintiff must produce some evidence in support of all facts necessary for a finding of personal jurisdiction, and the burden of proof never shifts to the party challenging jurisdiction. A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 80 (2nd Cir. 1993); United Elec. Workers v. 163 Pleasant Street Corp., 987 F.2d 39, 43-44 (1st Cir. 1993); Conti v. Pneumatic Products Corp., 977 F.2d 978, 987 (6th Cir. 1992); Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992); Gould v. P.T. Krakatau Steel, 957 F.2d 573, 575 (8th Cir. 1992), cert. denied,

...... U.S. ......, 113 S.Ct. 304 (1992). "In determining whether a *prima facie* showing has been made, the district court is not acting as a fact finder. It accepts properly supported proffers of evidence by a plaintiff as true." *Boit,* 967 F.2d at 675. However, the plaintiff must introduce some evidence and may not simply rely on the allegations of the complaint to establish personal jurisdiction. *See Abbott-Interfast,* 107 Nev. at 873, 821 P.2d at 1044; *Davis,* 97 Nev. at 337, 629 P.2d at 1213. *See also United Elec. Workers,* 987 F.2d at 44; *Boit,* 967 F.2d at 675. "[W]hen factual disputes arise in a proceeding that challenges personal jurisdiction, those disputes must be resolved in favor of the plaintiff." *Levinson,* 103 Nev. at 407, 742 P.2d at 1026. *See A.I. Trade Finance, Inc.,* 989 F.2d at 79-80; *Doe,* 974 F.2d at 145; Leidy's, Inc. v. H20 Engineering, Inc., 811 P.2d 38, 40 (Colo. 1991).

If the plaintiff makes a prima facie case of jurisdiction prior to trial, the plaintiff must still prove personal jurisdiction at trial by a preponderance of the evidence. Rano v. Sipa Press, Inc., 987 F.2d 580, 587 n.3 (9th Cir. 1993); *Boit,* 967 F.2d at 675-76; Dakota Industries v. Dakota Sportswear, 946 F.2d 1384, 1387 (8th Cir. 1991); Metropolitan Life Ins. Co. v. Neaves, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990); Anderson v. Am. Soc. of Plastic Surgeons, 807 P.2d 825, 827 (Utah 1990), *cert. denied,* ...... U.S. ......, 112 S.Ct. 276 (1991). At trial, the plaintiff does not have the luxury of having all disputed jurisdictional facts resolved in his or her favor.

The procedure described above occurs where the trial court hears the pretrial jurisdictional motion based on affidavits, depositions, and other discovery materials. *See Rano,* 987 F.2d at 587 n.3; *Anderson,* 807 P.2d at 827. The trial court, however, also has the option of conducting a full evidentiary hearing on the personal jurisdiction issue prior to trial. *See A.I. Trade Finance, Inc.,* 989 F.2d at 79-80; *Rano,* 987 F.2d at 587 n.3; *Conti,* 977 F.2d at 987; *Boit,* 967 F.2d at 674, 677. Where a full evidentiary hearing is held, the plaintiff must prove personal jurisdiction by a preponderance of the evidence or face dismissal of his or her claim.[2] *Boit,* 967 F.2d at 676; Lake v. Lake, 817 F.2d 1416, 1420

---

[2]A pretrial evidentiary hearing may not always be appropriate, as recognized by the following statement of the Utah Supreme Court:

> When jurisdiction turns on the same facts as the merits of the case, an evidentiary hearing is inappropriate because it infringes on the right to a jury trial and is an inefficient use of judicial resources (hearing the same evidence twice); in such cases—if the plaintiff has made a prima facie showing—jurisdiction is determined by trial on the merits. . . .

Anderson v. Am. Soc. of Plastic Surgeons, 807 P.2d 825, 827 (Utah 1990),

(9th Cir. 1987); *Anderson,* 807 P.2d at 827. If a plaintiff has presented a prima facie case of personal jurisdiction prior to trial in a non-evidentiary hearing, the defendant may still require the plaintiff to prove personal jurisdiction by a preponderance of the evidence in a pretrial evidentiary hearing rather than being forced to wait until trial to put the plaintiff to full proof. *A.I. Trade Finance, Inc.,* 989 F.2d at 79; *Boit,* 967 F.2d at 676; *Lake,* 817 F.2d at 1420. If such an evidentiary hearing occurs, the plaintiff's evidence does not receive the same presumption of credibility which it does when only a prima facie case is required. *See Boit,* 967 F.2d at 676, 678; *Lake,* 817 F.2d at 1420.

GNLV bases its assertion of personal jurisdiction in part on the contacts of Trump's agent, and the standard for proving an agency relationship when personal jurisdiction is contested is closely related to the standard for proving jurisdiction itself. The contacts of an agent are attributable to the principal in determining whether personal jurisdiction exists. Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990). Where the plaintiff seeks to establish personal jurisdiction against the defendant by attributing the contacts of the defendant's agent with the forum to the defendant, the burden of proof in establishing the agency depends on the type of personal jurisdiction inquiry that is involved. In a pretrial, non-evidentiary hearing, where only a prima facie case of personal jurisdiction need be made, the agency relationship through which contacts are attributed to the defendant also need only be established by prima facie evidence. First Chicago Intern. v. United Exchange Co., Ltd., 836 F.2d 1375, 1378-79 (D.C.Cir. 1988); Green v. McCall, 710 F.2d 29, 33 (2d Cir. 1983); Grove Press, Inc. v. Angleton, 649 F.2d 121, 123 (2d Cir. 1981); Walker v. Newgent, 583 F.2d 163, 167 (5th Cir. 1978), *cert. denied,* 441 U.S. 906 (1979). When such a prima facie showing of agency is made prior to trial, however, the agency through which the jurisdictional contacts are based must be proven by a preponderance of the evidence at trial. *See* Barbara Oil Co. v. Kansas Gas Supply Corp., 827 P.2d 24, 32 (Kan. 1992). The plaintiff must also prove agency by a preponderance of the evidence where, in a pretrial, evidentiary hearing, the

---

*cert. denied,* ...... U.S. ......, 112 S.Ct. 276 (1991). *Accord* Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 677 (1st Cir. 1992). However, the prima facie standard, under which personal jurisdiction is not finally resolved until trial, may be undesirable where the defendant will incur "significant expense and burden of trial on the merits in the foreign forum that is unfair in the circumstances." *Boit,* 967 F.2d at 677.

plaintiff asserts jurisdiction based on the contacts of the defendant's agent.

*Agency*

In arguing that Trump, as an individual, is subject to in personam jurisdiction before the district court, GNLV asserts that Ribis' contacts with Nevada should be attributed to Trump because Ribis acted as Trump's personal agent. Since the action on appeal before us lies only against Trump as an individual, and not against any Trump corporation, GNLV must show that Ribis acted as Trump's personal agent in order to attribute Ribis' contacts with Nevada to Trump for purposes of establishing personal jurisdiction.[3] *See* Green v. McCall, 710 F.2d 29, 33 (2d Cir. 1983) (there is no "jurisdiction over a defendant in his individual capacity based on an agent's tortious act within the state unless the agent was representing the defendant in his individual capacity"); Barrett v. United States, 646 F.Supp. 1345, 1351 (S.D.N.Y. 1986); Hare v. Family Publications Service, Inc., 342 F.Supp. 678, 683 (D.Md. 1972). In the instant case, GNLV needed only to make a prima facie case before the district court that Ribis acted as Trump's personal agent and therefore that Ribis' contacts with Nevada were attributable to Trump. We conclude that GNLV made the required showing.

GNLV presented evidence before the district court that Ribis acted in a dual capacity, both as a corporate agent and as an agent for Trump individually. GNLV introduced an affidavit by Ribis stating:

> Prior to the commencement of my employment by Trump Taj Mahal Associates in February, 1991, I was engaged in the private practice of law in the State of New Jersey. *I have*

---

[3] "An agency relationship is formed when one who hires another retains a contractual right to control the other's manner of performance." Grand Hotel Gift Shop v. Granite St. Ins., 108 Nev. 811, 815, 839 P.2d 599, 602 (1992). The burden of proving an agency relationship rests on the party asserting that such a relationship exists. Century Ready-Mix v. Campbell County, 816 P.2d 795, 799 (Wyo. 1991); Hand Realty Co. v. Meyers, 672 P.2d 583, 585 (Kan. 1983). *See* 3 Am.Jur.2d *Agency* § 359 (1986). While there is no presumption of agency, and the relationship must be proved, the relationship may be established by circumstantial evidence. 3 Am.Jur.2d *Agency* §§ 360, 362 (1986). *See* Trans Union Leasing Corp. v. Hamilton, 600 P.2d 256, 258 (N.M. 1979); Pavlic v. Woodrum, 486 N.W.2d 533, 535 (Wis.Ct.App. 1992). To prevail at trial, the agency relationship must be proved by a preponderance of the evidence. Barbara Oil Co. v. Kansas Gas Supply Corp., 827 P.2d 24, 32 (Kan. 1992).

*known and represented Donald J. Trump personally since 1979* and have represented him and his various business entities in the State of New Jersey since that time. Through the course of my representation of Donald J. Trump and his various business entities, I have come to know Mr. Trump very well and am familiar with his personal circumstances.

(Emphasis added.) The employment agreement between Ribis and Trump, entered into by letter dated January 10, 1991, further supports GNLV's assertion that Ribis acted as Trump's personal agent. It states, in part:

Pursuant to our discussions this letter will confirm our agreement as to my relationship with you and your casino companies. This will confirm that I will act as the chief executive officer and The Trump Organization's senior officer (of course I will be reporting only to you) with respect to its Atlantic City operations, . . . Trump Taj Mahal Casino Resort . . . and all other related gaming, hotel and other operations coordinated by The Trump Organization[4] in New Jersey or elsewhere.

In this position it is my understanding that I will have the authority to participate in all decisions affecting The Trump Organization . . . .

(Footnote added.) The section of the employment letter discussing compensation provides:

As additional compensation you [Trump], at your sole discretion, will pay an additional bonus for the work I have completed and the success of the hotel/casino operations. Also, at your sole discretion, in the event that The Trump Organization or any of the gaming/hotels completes a public offering, a private placement or a debt conversion I will be a participant in those transactions.

The employment contract further provides for full payment to Ribis "if either of us terminate our relationship for any reason." Above Trump's signature on the contract appear the words, "Accepted and approved on behalf of Donald J. Trump, Trump's Castle Associates, Trump Plaza Associates, Trump Taj Mahal Associates." Below the signature line appear the words, "BY: DONALD J. TRUMP."

---

[4]GNLV introduced prima facie evidence that the Trump Organization is a fictitious name under which Trump conducted business as an individual. GNLV introduced a "Business Certificate," recorded in New York City, which states, "I hereby certify that I am conducting or transacting business under the name or designation of *The Trump Organization* [and] [m]y full name is *Donald J. Trump.*"

While the evidence set forth above suggests that Ribis acted as both a corporate agent and Trump's personal agent, we must determine whether the contacts of Ribis in the specific circumstance of hiring Gomes were contacts as a personal agent of Trump or as an agent of the Trump corporations. *See* Barrett v. United States, 646 F.Supp. 1345, 1351 (S.D.N.Y. 1986) (where defendants are sued in an individual capacity and defendants may have acted in individual or in other capacity, "[i]t is . . . necessary to determine whether an agency relationship, legally cognizable for jurisdictional purposes, existed between the defendants in their capacity as *individuals* and their alleged agents").

The district court found that the fact that Trump was the sole stockholder and sole director of the Trump corporations "support[ed] an inference that Mr. Trump may have been acting individually as well as in a corporate capacity. This inference is further supported by the fact that Mr. Trump signed Gomes' employment contract twice, creating an ambiguity as to whether the parties intended Mr. Trump to be personally liable." The district court assessed Trump's personal interest as: "[t]he motivation on Trump's part being a desire to take a corporate executive away from what he perceived as Steve Wynn's Golden Nugget in their ongoing rivalry, as made clear in Mr. Trump's book[5] and the affidavits on file with the Court." (Footnote added.) The district court's order concludes:

> [T]here is a prima facie showing that the individual defendant and his personal agent acted in the personal interest of the individual defendant, and did not act exclusively in the interests of the entities.

We determine that the district court did not err in reaching these conclusions. Trump signed Gomes' employment agreement twice. Above the two signature lines on the contract appear the words: "TRUMPS TAJ MAHAL & ASSOCIATES by its general partners dba TAJ MAHAL HOTEL & CASINO." The first signature line reads: "By: *(signature)*" with "DONALD J. TRUMP President" underneath it. The second signature line contains Trump's signature and simply states, "DONALD J. TRUMP" underneath it. The manner in which Gomes' employment contract was signed constitutes prima facie evidence that Trump personally guaranteed the terms of the contract. In addition, GNLV introduced evidence of personal animosity between Wynn and Trump. Trump's two signatures on Gomes' employment contract, along with his known antagonism for Wynn, suggest that Trump acted as an individual and in part for personal

---

[5]GNLV introduced evidence from Trump's book, *The Art of the Deal.*

purposes in entering into the Gomes employment contract. *See* Trident Construction v. West Electric, 105 Nev. 423, 428, 776 P.2d 1239, 1242 (1989). *See also* Moldan v. First National Bank of Miami, 174 So.2d 780, 781 (Fla.Ct.App. 1965). We conclude that GNLV presented a prima facie case that Trump acted at least partly in an individual capacity in entering into the Gomes employment contract.

By showing that Trump acted, at least in part, in an individual capacity in hiring Gomes, GNLV has shown that Ribis' assistance in relation to the hiring process was at least in part that of a personal agent rather than that of a corporate agent. We conclude that GNLV made a prima facie showing that Ribis acted at least in part as Trump's personal agent when Ribis negotiated Gomes' employment contract. Accordingly, for purposes of the pretrial, prima facie personal jurisdiction determination, Ribis' contacts with Nevada are properly attributable to Trump individually. Of course, at trial, GNLV must prove by a preponderance of the evidence that Ribis acted as Trump's personal agent if GNLV attempts to prove personal jurisdiction by attributing Ribis' contacts to Trump.

*General and Specific Personal Jurisdiction*

To obtain jurisdiction over a non-resident defendant, a plaintiff must show: (1) that the requirements of the state's long-arm statute have been satisfied, and (2) that due process is not offended by the exercise of jurisdiction. *See* Inst. Food Marketing v. Golden State Strawberries, 747 F.2d 448, 452 (8th Cir. 1984); Vishay Intertechnology, Inc. v. Delta Intern. Corp., 696 F.2d 1062, 1064 (4th Cir. 1982). In the instant case, Trump does not contend that the long-arm statute was not satisfied, and, since Nevada's long-arm statute has been construed to extend to the outer reaches of due process, the two inquiries in the instant case may be collapsed into one. *See* Certain-Teed Prods. v. District Court, 87 Nev. 18, 23, 479 P.2d 781, 784 (1971).

"'The Due Process Clause of the 14th Amendment requires that a defendant be subject to the personal jurisdiction of the court.'" Tandy Computer Leasing v. Terina's Pizza, 105 Nev. 841, 843, 784 P.2d 7, 7 (1989) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980)). Due process requires "minimum contacts" between the defendant and the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Mizner v. Mizner, 84 Nev. 268, 270, 439 P.2d 679, 680 (1968), *cert. denied,* 393 U.S. 847 (1968) (quoting International Shoe Co. v.

Washington, 326 U.S. 310, 316 (1945)). *See* Judas Priest v. District Court, 104 Nev. 424, 426, 760 P.2d 137, 138 (1988); McDermond v. Siemens, 96 Nev. 226, 228, 607 P.2d 108, 109-110 (1980). The defendant must have sufficient contacts with the forum such that he or she could reasonably anticipate being haled into court there. *See* Galatz v. District Court, 100 Nev. 408, 413, 683 P.2d 26, 29 (1984), *cert. denied,* 471 U.S. 1135 (1985); *see also* World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) ("the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there"). Additionally, "the exercise of jurisdiction must be reasonable." *Judas Priest,* 104 Nev. at 426, 760 P.2d at 138.

This court's opinions have separated the personal jurisdiction due process inquiry into two separate areas: general personal jurisdiction and specific personal jurisdiction. General jurisdiction occurs where a defendant is held to answer in a forum for causes of action unrelated to the defendant's forum activities. Budget Rent-A-Car v. District Court, 108 Nev. 483, 485, 835 P.2d 17, 19 (1992) (citing Perkins v. Benquet Mining Co., 342 U.S. 437, 446-47 (1952)). General jurisdiction over the defendant "is appropriate where the defendant's forum activities are so 'substantial' or 'continuous and systematic' that it may be deemed present in the forum." *Budget Rent-A-Car,* 108 Nev. at 485, 835 P.2d at 19 (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415 (1984)); Price and Sons v. District Court, 108 Nev. 387, 390, 831 P.2d 600, 601 (1992). General jurisdiction will only lie where the level of contact between the defendant and the forum state is high. *Budget Rent-A-Car,* 108 Nev. at 485, 835 P.2d at 19; *Price and Sons,* 108 Nev. at 390, 831 P.2d at 601; *see Helicopteros Nacionales de Columbia, S.A.,* 466 U.S. at 416 (no jurisdiction in Texas over foreign corporation that sent officers to Texas for a negotiation session, accepted checks drawn on a Texas bank, and sent personnel to Texas to be trained).

Absent general jurisdiction, specific personal jurisdiction over a defendant may be established only where the cause of action arises from the defendant's contacts with the forum. *Budget Rent-A-Car,* 108 Nev. at 486, 835 P.2d at 20; *Price and Sons,* 108 Nev. at 390, 831 P.2d at 602. A state may exercise specific personal jurisdiction only where: (1) the defendant purposefully avails himself of the privilege of serving the market in the forum

or of enjoying the protection of the laws of the forum, or where the defendant purposefully establishes contacts with the forum state and affirmatively directs conduct toward the forum state, and (2) the cause of action arises from that purposeful contact with the forum or conduct targeting the forum. *Budget Rent-A-Car,* 108 Nev. at 487, 835 P.2d at 20 (citing *World-Wide Volkswagen Corp.,* 444 U.S. at 291, 297); MGM Grand, Inc. v. District Court, 107 Nev. 65, 69, 807 P.2d 201, 203 (1991); *see* Burger King v. Rudzewicz, 471 U.S. 462, 474 (1985); Brainerd v. Governors of the University of Alberta, 873 F.2d 1257, 1259 (9th Cir. 1989) ("[t]he purposeful availment requirement . . . may also be satisfied if the defendant intentionally directed his activities into the forum"); Munley v. District Court, 104 Nev. 492, 495-96, 761 P.2d 414, 416 (1988) ("the cause of action must have a specific and direct relationship or be intimately related to the forum contacts," which must be significant and substantial, and cannot be "random," "fortuitous," or "attenuated"). The criteria for exercising specific in personam jurisdiction over an out-of-state defendant has been delineated as follows:

> The defendant must purposefully avail himself of the privilege of acting in the forum state or of causing important consequences in that state. The cause of action must arise from the consequences in the forum state of the defendant's activities, and those activities, or the consequences thereof, must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Jarstad v. National Farmers Union, 92 Nev. 380, 387, 552 P.2d 49, 53 (1976); *see* Abbott v. Harrah, 90 Nev. 321, 324, 526 P.2d 75, 76 (1974); Certain-Teed Prods. v. District Court, 87 Nev. 18, 23, 479 P.2d 781, 785 (1971); *see also* McGlinchy v. Shell Chemical Co., 845 F.2d 802, 816 (9th Cir. 1988). "[I]t is the cumulative significance of all the activities conducted in the jurisdiction rather than the isolated effect of any single activity that is determinative." *Abbott,* 90 Nev. at 324, 526 P.2d at 76. Furthermore, "[i]t is the quality of these contacts, . . . and not the quantity, that confers personal jurisdiction over a defendant." *Brainerd,* 873 F.2d at 1259.

" '[W]here a defendant who purposely has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' " Levinson v. District Court, 103 Nev. 404, 408, 742 P.2d 1024, 1026 (1987) (quoting *Burger King,* 471 U.S. at 477). The United States

Supreme Court has stated that questions involving personal jurisdiction mandate an inquiry into whether it is "'reasonable . . . to require [the defendant] to defend the particular suit which is brought there.'" *World-Wide Volkswagen Corp.*, 444 U.S. at 292 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)); *see* MGM Grand, Inc. v. District Court, 107 Nev. 65, 67, 807 P.2d 201, 202 (1991). Factors relevant to this inquiry are: (1) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; and (4) the interest of the several states in furthering substantive social policies. *World-Wide Volkswagen Corp.*, 444 U.S. at 292; *see* Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102, 113 (1987); *see also MGM Grand, Inc.*, 107 Nev. at 67-68, 807 P.2d at 202; Judas Priest v. District Court, 104 Nev. 424, 426-27, 760 P.2d 137, 139 (1988). The state has a recognized interest in providing an effective means of redress for its residents. *Levinson,* 103 Nev. at 408, 742 P.2d at 1026.

Trump is a resident of New York. GNLV presented no evidence that Trump: (1) owns any property in Nevada or has any interest in any property in Nevada; (2) has physically entered the state of Nevada; (3) has conducted business in Nevada or engaged in any persistent course of conduct within the state; or (4) derives any revenues from any goods consumed or services rendered within Nevada. However, GNLV introduced evidence as to the following contacts of Trump with Nevada, including those contacts of Ribis attributable to Trump.

After Gomes asked DeSanctis to inform the Trump enterprises that Gomes was interested in working for them, Ribis consulted Trump and then contacted Gomes in Nevada to discuss Gomes' potential employment with the Taj Mahal. Trump spoke with Gomes once over the telephone while Gomes was in Nevada. Gomes was given a copy of DeSanctis' employment contract, which was used as the foundation for the development of Gomes' employment contract. Changes were made to the base contract, and drafts were sent back and forth between Ribis in New Jersey and New York and Gomes and his attorney brother in Nevada. An employment agreement was reached and an employment contract was signed by Trump in New York. Gomes signed the contract in Nevada. While the contract identified Gomes as a Nevada resident and provided indemnity for costs and attorneys fees which might result if Gomes were sued because of the contract, it also contained a New Jersey choice-of-law provision. As part of the

employment agreement, a trust was also set up for the benefit of Gomes. The trust was to be established in Nevada, through First Interstate Bank of Nevada, and the trust contained a Nevada choice-of-law clause. Trump signed the trust agreement in New York, after which it was forwarded to Gomes, who signed it in Nevada and sent it to the trustee, First Interstate. The Taj Mahal wired money to Nevada into Gomes' personal account and into Gomes' trust account. The contract which Trump is alleged to have induced a breach of was entered into in Nevada, between a Nevada resident and a Nevada corporation, and the effects of the breach were felt by GNLV in Nevada.

Because Trump did not maintain any type of continuous and systematic contacts with Nevada, the district court had no general personal jurisdiction over Trump. The specific jurisdiction inquiry is the proper one here because Trump's contacts with Nevada constitute the actions which GNLV asserts facilitated and caused the interference with GNLV's contract for which Trump is being sued.

For Trump to be haled into court in Nevada, he must have purposefully availed himself of Nevada's laws or markets or affirmatively directed his conduct toward Nevada, and any connection with Nevada must be more than fortuitous. We conclude that, through the contacts previously described, Trump purposefully directed his conduct toward the forum of Nevada and purposefully availed himself of the laws of Nevada. *See* FMC Corp. v. Varonos, 892 F.2d 1308, 1313 (7th Cir. 1990); Vishay Intertechnology, Inc. v. Delta Intern. Corp., 696 F.2d 1062, 1067, 1069 (4th Cir. 1982); Murphy v. Erwin-Wasey, Inc., 460 F.2d 661, 664-65 (1st Cir. 1972); Pure, Ltd. v. Shasta Beverages, Inc., 691 F.Supp. 1274, 1278 (D.Haw. 1988); Cal Caulfield and Co. v. Colonial Nursing Homes, 642 F.Supp. 777, 781 (D.Kan. 1986); Abbott Power Corp. v. Overhead Electric Co., 131 Cal.Rptr. 508, 512-14 (Cal.Ct.App. 1976). Since GNLV's action against Trump directly relates to Trump's contacts with Nevada and arises, in part, from the consequences of Trump's conduct in Nevada, Trump should have reasonably anticipated being haled into court in this state. Trump continually negotiated Gomes' contract with Gomes and his attorney brother while Gomes resided in Las Vegas. The negotiations included many telephone calls to Gomes in Nevada, as well as the delivery of many documents, including the offending document, into Nevada. Most significantly, however, Trump specifically targeted Nevada, and purposefully availed himself of the protection of the laws of Nevada, in creating the irrevocable trust which was part of Gomes' employment agreement. The trust established a Nevada trust fund, with First Interstate as the trustee and Trump as the

settlor. Trump wired $650,000 into this trust fund from New Jersey. The trust agreement contained a Nevada choice-of-law clause. In creating a Nevada trust with a Nevada choice-of-law provision, Trump should have reasonably anticipated being haled into court in Nevada. *See* Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1331 (9th Cir. 1984), *cert. denied,* 471 U.S. 1066 (1985).

Despite having "minimum contacts" with Nevada, Trump could still defeat personal jurisdiction in Nevada if he could make a compelling case that the exercise of jurisdiction over him in Nevada would be unreasonable. Trump's only argument in this vein is that New Jersey is an alternative forum and GNLV is currently involved in a number of legal disputes before the New Jersey courts and owns land and investments in New Jersey. While this weighs slightly against the exercise of jurisdiction over Trump by the Nevada district court, Nevada has an interest in providing an effective means of judicial redress for its residents. Where possible, a Nevada resident should be able to obtain judicial redress in the most convenient, cost-effective manner, which in this case would be within Nevada. The four "reasonableness factors" set forth in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980), do not militate against the exercise of personal jurisdiction over Trump in the instant case.

## CONCLUSION

Trump and his business entities, through their agent, hired a Nevada resident who was employed by a Nevada corporation operating a business in Las Vegas, and he created a Nevada trust. Requiring him to respond to GNLV's charges in the state of Nevada is entirely reasonable and not offensive to traditional notions of fair play and substantial justice. The district court's determination that GNLV had established a "prima facie" case of personal jurisdiction over Trump is supported by substantial evidence.

We have considered all other arguments in the petition and we find them to be unpersuasive. Accordingly, Trump's petition for a writ of prohibition restraining the district court from exercising personal jurisdiction over him in this matter is denied.

ROSE, C. J., STEFFEN, YOUNG and SPRINGER, JJ., and McGEE, D. J.,[6] concur.

---

[6]The Honorable Charles M. McGee, Judge of the Second Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE MIRIAM SHEARING, Justice. Nev. Const., art. 6, § 4.