**131 Nev., Advance Opinion 29**
IN THE SUPREME COURT OF THE STATE OF NEVADA

CATHOLIC DIOCESE OF GREEN BAY, INC.,
Appellant,
vs.
JOHN DOE 119,
Respondent.

No. 62840

FILED

MAY 28 2015

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK



Appeal from a final judgment in a tort action. Eighth Judicial District Court, Clark County; Valorie J. Vega, Judge.

*Reversed.*

Mazzeo Law LLC and Peter A. Mazzeo, Las Vegas,
for Appellant.

Matthew L. Sharp, Reno; Jeff Anderson & Associates, P.A., and Michael G. Finnegan and Jeffrey R. Anderson, St. Paul, Minnesota,
for Respondent.

BEFORE THE COURT EN BANC.

## OPINION

By the Court, CHERRY, J.:

Here we consider whether Nevada courts have personal jurisdiction over a foreign Catholic diocese. The Catholic Diocese of Green Bay, a religious organization incorporated and headquartered in Wisconsin, employed Father John Feeney as a priest. Feeney later served as a priest in California before coming to the Diocese of Reno-Las Vegas.

SUPREME COURT
OF
NEVADA

(O) 1947A

10/8/15: Corrected per letter to publishers. CJ

15-16230

It was alleged that, during Feeney's time in Las Vegas, Feeney sexually assaulted John Doe 119. Doe sued the Diocese of Green Bay for negligently hiring and retaining Feeney, asserting that the Diocese is responsible for the injuries caused by the sexual abuse.

We conclude that the district court did not have personal jurisdiction over the Diocese of Green Bay in this case. The Diocese did not have sufficient contacts with Nevada. The Catholic doctrine of incardination, whereby Feeney promised obedience to the Diocese of Green Bay, is insufficient to establish a legal employment or agency relationship between Feeney and the Diocese. Accordingly, we reverse the judgment against the Diocese.

## FACTS AND PROCEDURAL HISTORY

Doe filed this negligence suit against the Diocese of Green Bay in the Eighth Judicial District Court. Doe alleged that Feeney molested him in 1984, but that it was not until around 2008 that he discovered that his psychological injuries were the result of Feeney's acts of abuse. Doe alleged that Feeney was an agent of the Diocese of Green Bay at the time that he molested Doe in Las Vegas. Doe further alleged that, at the time of the abuse, the Diocese was aware that Feeney had molested other children in Wisconsin. He claimed that the Diocese negligently retained and supervised Feeney and failed to warn others that Feeney was a danger to children.

After an evidentiary hearing held during the trial, the district court concluded that it had jurisdiction over the Diocese. The district court found that Feeney served both the Reno-Las Vegas and the Green Bay Dioceses: While the Diocese of Reno-Las Vegas oversaw Feeney's daily activities, the court found that Feeney was originally incardinated in the Diocese of Green Bay and, therefore, had made a promise of obedience to

SUPREME COURT
OF
NEVADA

(O) 1947A

2

the Diocese of Green Bay. The court further found that the Diocese of Green Bay had the ability to restrict Feeney's ministry, could recall him to Green Bay, and maintained his pension.

Besides any employment relationship, the district court also found that the Diocese of Green Bay had two other contacts with Nevada. It found that the Diocese of Green Bay gave Feeney a positive recommendation via a letter of good standing. And it further found that the Vicar-General of the Diocese of Green Bay spoke to the Bishop of Reno-Las Vegas about Feeney's placement.

After a lengthy trial, the jury returned a verdict in favor of Doe on the negligence claims. The Diocese of Green Bay appealed, arguing that the district court lacked personal jurisdiction over the Diocese.

## DISCUSSION

When reviewing a district court's exercise of jurisdiction, we review legal issues de novo but defer to the district court's findings of fact if they are supported by substantial evidence. *See Baker v. Eighth Judicial Dist. Court*, 116 Nev. 527, 531, 999 P.2d 1020, 1023 (2000) (stating standard of review for personal jurisdiction).

For a court to have personal jurisdiction over a nonresident defendant, a plaintiff must establish, by a preponderance of the evidence, that (1) Nevada's long-arm statute, NRS 14.065, is satisfied; and (2) the exercise of jurisdiction does not offend due process. *Arbella Mut. Ins. Co. v. Eighth Judicial Dist. Court*, 122 Nev. 509, 512, 134 P.3d 710, 712 (2006); *Trump v. Eighth Judicial Dist. Court*, 109 Nev. 687, 693, 857 P.2d 740, 744 (1993). Because Nevada's long-arm statute is coterminous with the limits of constitutional due process, *Arbella Mut. Ins.*, 122 Nev. at 512, 134 P.3d at 712; *see* NRS 14.065, these two requirements are the same.

The United States Supreme Court analyzes the constitutionality of an exercise of jurisdiction in two distinct ways: general personal jurisdiction and specific personal jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. ___, ___, 134 S. Ct. 746, 754 (2014). With respect to general jurisdiction, the Supreme Court typically looks at a corporation's place of incorporation or its principal place of business in ascertaining whether jurisdiction exists. *Id.* ~~*See Daimler*, 571 U.S.~~ at ___, 134 S. Ct. at 760. The parties here do not dispute that the Diocese of Green Bay is incorporated in Wisconsin and that its principal place of business is also in Wisconsin. Doe does not present any argument that the Diocese is essentially at home in Nevada. *See Id.* ~~*Daimler*, 571 U.S.~~ at ___, 134 S. Ct. at 761. Therefore, general jurisdiction does not apply to this case.

A court has specific jurisdiction over a defendant when the defendant has certain minimum contacts with the forum state and an exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. *Id.* ~~*See Daimler*, 571 U.S.~~ at ___, 134 S. Ct. at 754. This court follows a three-part test to determine whether a court may exercise specific jurisdiction. First, the defendant must "purposefully avail[ ] himself of the privilege of serving the market in the forum or of enjoying the protection of the laws of the forum," or the defendant must "purposefully establish[ ] contacts with the forum state and affirmatively direct[ ] conduct toward the forum state." *Arbella*, 122 Nev. at 513, 134 P.3d at 712-13 (internal quotations omitted). Second, the cause of action must arise "from that purposeful contact with the forum or conduct targeting the forum." *Id.* at 513, 134 P.3d at 713 (internal quotations omitted). Third, "a court must consider whether requiring the defendant to appear in the action would be reasonable" or, in the United States Supreme Court's terminology, whether the exercise of jurisdiction

comports with fair play and substantial justice. *Id.* at 512-13, 134 P.3d at 712-13.

Our inquiry is focused on the first part of the test: Did the Diocese purposefully avail itself of Nevada law or otherwise establish contacts with or direct conduct toward Nevada? We conclude that it did not.

*Purposeful availment*

Purposeful availment occurs when one "purposefully directs her conduct towards Nevada." *Dogra v. Liles*, 129 Nev., Adv. Op. 100, 314 P.3d 952, 955 (2013). "Thus, 'the mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Furthermore, "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen*, 444 U.S. at 295. "Rather, [the foreseeability relevant to due process] is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297.

In a case factually similar to this one, the New Mexico Court of Appeals held that a Boise priest "select[ing] New Mexico from among several other possible diocesan destinations in which to seek employment . . . does not constitute a purposeful act by the Boise Diocese to avail itself of the benefits and protections of New Mexico law." *Doe v. Roman Catholic Diocese of Boise, Inc.*, 918 P.2d 17, 23 (N.M. Ct. App. 1996). The New Mexico court also noted that giving "permission to leave Idaho [does not] constitute activity whereby the Boise Diocese could reasonably anticipate being haled into court in New Mexico for any and all tortious acts alleged to have subsequently been committed by" the priest.

*Id.* The court emphasized that it was "the acts of the Boise Diocese, not the acts of [the priest], that must provide the basis for this state exercising personal jurisdiction over the Boise Diocese." *Id.*

Other courts have also focused the inquiry on whether a diocese purposefully placed a priest in another state or, conversely, the priest was acting of his own accord. The Washington Court of Appeals held that jurisdiction *did* exist where the diocese itself placed the priest in Washington. *Does 1-9 v. Compcare, Inc.*, 763 P.2d 1237, 1243 (Wash. Ct. App. 1988). Conversely, in an unpublished case, a Delaware Superior Court found no jurisdiction where the priest unilaterally traveled into Delaware to molest children. *Tell v. Roman Catholic Bishops of Diocese of Allentown*, 2010 WL 1691199, at *15-16 (Del. Super. Ct. Apr. 26, 2010).

Likewise, our inquiry focuses on the Diocese's purposeful conduct toward Nevada. Feeney's unilateral choice to seek employment here is not relevant. The question is whether the Diocese established minimum contacts with Nevada, either by direct contact with the state or through Feeney as its agent.

*The Diocese's contacts with Nevada*

According to the district court's findings, the Diocese of Green Bay had the following contacts with Nevada: (1) it gave Feeney a letter of recommendation, (2) it spoke to the Bishop of Reno-Las Vegas about Feeney, (3) it periodically monitored and had contact with Feeney, and (4) it maintained some sort of employment or controlling relationship with Feeney.

Contrary to the district court's findings, the Green Bay Diocese's letter of recommendation is not evidence of purposeful availment in Nevada. The letter was addressed to a Bishop in California regarding Feeney's possible employment in California. It was merely Feeney's

unilateral act of seeking employment in Nevada that resulted in the letter's transmission to the Diocese of Reno-Las Vegas. Such unilateral acts on the part of a third party cannot create jurisdiction over a defendant. *See Dogra*, 129 Nev., Adv. Op. 100, 314 P.3d at 955. And, along the same lines, the Green Bay Diocese's receipt of a phone call from the Las Vegas Diocese, possibly regarding an employment recommendation, is not purposeful availment of a foreign jurisdiction's law.

Only the third and fourth facts, the alleged monitoring and employment of Feeney, could have any bearing on personal jurisdiction. The alleged monitoring appears to have been little more than the occasional letter between Feeney and the Vicar General of the Diocese of Green Bay—but receiving and sending letters is not purposeful availment. The content of the letters, however, may indicate a relationship with Feeney during his time in Las Vegas. This of course suggests the following issue: Was Feeney an employee or agent of the Diocese of Green Bay such that it, through Feeney, subjected itself to Nevada's jurisdiction?

*Agency, control, and the doctrine of incardination*

The district court found that Feeney was employed by both the Diocese of Reno-Las Vegas and the Diocese of Green Bay. The district court's analysis appears to center on three findings. First, it found that the Diocese of Green Bay maintained Feeney's pension. Second, it found that the Diocese monitored Feeney and could restrict his ministry. Third, it found that Feeney had made a promise of obedience to the Diocese through the Catholic doctrine of incardination.

"At common law, an employment relationship was defined by agency principles . . . ." *Boucher v. Shaw*, 124 Nev. 1164, 1167, 196 P.3d 959, 961 (2008). "An agency relationship results when one person

possesses the contractual right to control another's manner of performing the duties for which he or she was hired." *Hamm v. Arrowcreek Homeowners' Ass'n*, 124 Nev. 290, 299, 183 P.3d 895, 902 (2008). To determine control in an employment relationship under Nevada labor statutes, courts consider the following indicia: "whether the employer has the right to direct the daily manner and means of a person's work, whether the worker is required to follow the putative employer's instructions, and whether the worker can refuse work offered without ramification." *State Dep't of Emp't, Training & Rehab., Emp't Sec. Div. v. Reliable Health Care Servs. of S. Nev., Inc.*, 115 Nev. 253, 258, 983 P.2d 414, 417 (1999).

The district court's finding that the Diocese of Green Bay maintained Feeney's pension is not supported by the record. The record shows that Feeney's pension was maintained by a separate group, the Leo Benevolent Association. This association maintained contact with the Reno-Las Vegas Diocese during Feeney's employment there.

The district court also found that the Diocese of Green Bay monitored Feeney and that the Diocese could restrict Feeney's ministry or recall him to Green Bay. But there does not appear to be any evidence that the Diocese of Green Bay assigned daily tasks to Feeney that he could not refuse consistent with his employment.

The court's remaining support for finding an employment or agency relationship is the ecclesiastical doctrine of incardination. The Diocese's canonical law expert gave uncontradicted testimony explaining incardination as a kind of bond tying the priest to the diocese that ordains him:

> Let's say for example, a priest with the Diocese of Salt Lake City, who's incardinated there, chooses to serve in the Diocese of Las Vegas. Well, he remains incardinated in virtue of his ordination the Diocese of Salt Lake City.
>
> . . . .
>
> So when a cleric, deacon, priest or bishop, is incardinated in the diocese, it creates a bond with that diocese where that is kind of home base for that cleric. The diocese of incardination would have, for example, obligations of support. The diocese also makes a determination that there's a pastoral need in this diocese for you to help out with pastoral ministry. That's why we're ordaining you to this diocese and that's why we're going to create this tight relationship with the diocese.

The expert testified that incardination has no bearing on supervisory authority; the bishop in whose territory the priest is serving has supervisory authority. In other words, incardination alone is irrelevant to supervision and supervisory authority in the Catholic Church is tied to geographical location, with a bishop having complete authority to supervise priests ministering in his particular territory. Further, the Diocese's expert gave uncontradicted testimony that the Diocese did not have unrestricted authority, under Catholic doctrine, to recall Feeney or restrict his ministry.

We conclude that the ecclesiastical system of incardination does not conclusively establish employment or agency. The doctrine of incardination did not give the Diocese of Green Bay control or supervision over Feeney's day-to-day work in the Diocese of Reno-Las Vegas. In light

of the uncontradicted deposition and expert testimony, the district court's finding that Feeney could be recalled to Green Bay at any time was clearly erroneous. The district court made no other finding, and Doe does not point to any evidence showing, that the Diocese of Green Bay controlled Feeney's ministry in Las Vegas. Accordingly, the district court erred in holding that the Diocese of Green Bay controlled Feeney as an employee or agent in Nevada.

The doctrine of incardination may have some significance for courts. Certainly courts must sometimes consider a religious organization's ecclesiastical structure when making decisions regarding the organization. *See Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 709 (1976). We cannot opine on ecclesiastical matters; on those we must defer to the religious entity. *Id.* But whether the religious entity's corporate structure creates an employment relationship is a question of civil law that we may determine without opining on ecclesiastical matters. *Cf.* Ira C. Lupu & Robert W. Tuttle, *Secular Government, Religious People* 60 (Eerdmans 2014) ("If . . . the subject of a dispute falls outside" of ecclesiastical matters, "the court should . . . hear the case. Many aspects of the relationship between clergy and religious employers do not implicate ecclesiastical matters."). Here, the legal standards of employment such as control and direction, *see Reliable Health Care Servs.*, 115 Nev. at 258, 983 P.2d at 417, control our analysis, not the ecclesiastical doctrine of incardination.[1]

---

[1]Relatedly, the United States Supreme Court recently held that churches have absolute autonomy to determine who will serve as their ministers. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. ___, ___, 132 S. Ct. 694, 706 (2012) ("According the state the power to determine which individuals will minister to the
*continued on next page . . .*

## CONCLUSION

The Diocese of Green Bay did not have sufficient contacts with Nevada to show that it purposefully availed itself of the state's laws and protections. Feeney was not the Diocese's agent during his ministry in Las Vegas. His promise of obedience to the Diocese of Green Bay, through the ecclesiastical doctrine of incardination, is not sufficient to establish an agency or employment relationship. Therefore, we conclude that the district court did not have personal jurisdiction over the Diocese. We reverse the district court's decision.

_____, J.
Cherry

We concur:

_____, C.J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Saitta

_____, J.
Gibbons

_____, J.
Pickering

_____

. . . *continued*

faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."). Although we do not opine on the issue today, courts must be aware of the First Amendment issues that may be raised by these kinds of negligence actions.