**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GINA FIORE; KEITH GIPSON,
          *Plaintiffs-Appellants,*

v.

ANTHONY WALDEN; UNKNOWN
AGENTS OF THE FEDERAL
GOVERNMENT,
          *Defendants-Appellees.*

No. 08-17558

D.C. No.
2:07-cv-01674-
ECR-LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
Edward C. Reed, Senior District Judge, Presiding

Argued and Submitted
February 12, 2010—San Francisco, California

Filed September 12, 2011

Before: Alfred T. Goodwin, Marsha S. Berzon, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge Ikuta

17191

**COUNSEL**

Robert A. Nersesian and Thea Marie Sankiewicz, Nersesian & Sankiewicz, Las Vegas, Nevada, for the plaintiffs-appellants.

Michael F. Hertz, Acting Assistant Attorney General, and Barbara L. Herwig and Kelsi Brown Corkran, Attorneys, Civil Division, Department of Justice, Washington, D.C., for the defendants-appellees.

**OPINION**

BERZON, Circuit Judge:

Federal law enforcement officers seized funds from passengers who were temporarily in the Atlanta airport changing planes. The travelers, Gina Fiore and Keith Gipson, explained that the funds were legal gambling proceeds, not evidence of drug transactions. Their story turned out to be true. Fiore and Gipson claim the seizure and later efforts to institute forfeiture proceedings were unconstitutional. They sued in Las Vegas, where they were heading, lived at least part time, and suffered the inconvenience of arriving with absolutely no money, as well as other financial injuries. The district court dismissed this *Bivens*[1] action against the federal officers for lack of personal jurisdiction. We reverse and remand.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In July and August of 2006, Fiore and Gipson, professional gamblers, traveled from Las Vegas, Nevada, where both maintained residences, to casinos in Atlantic City, New Jersey, and San Juan, Puerto Rico, before returning to Las Vegas.[2] On their return trip on August 8, 2006, they left from San Juan, boarded a connecting flight in Atlanta, Georgia, and then flew to Las Vegas, their final destination.

In San Juan, an agricultural x-ray inspection and other additional screening showed no contraband in Fiore's or Gipson's luggage. At a Transportation Security Administration (TSA)

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).

[2] The facts are taken from Fiore and Gipson's first amended complaint and from a declaration by the defendant. Of course, at this preliminary stage, we do not know whether any of the facts alleged in the complaint are true, but simply assume that they are. *See Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010); *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006).

checkpoint, Fiore and Gipson were subjected to heightened security procedures because they were traveling on one-way tickets. They were screened for minute traces of illegal drugs; none was found. Search of their carry-on bags revealed approximately $48,000 in Gipson's carry-on bag and $34,000 in Fiore's carry-on bag, all carried openly. Gipson also had approximately $15,000 on his person. These funds, totaling approximately $97,000 in United States currency, included approximately $30,000 in seed money for gambling — their "traveling bank" — brought with them from Las Vegas.[3]

After this cash was discovered, San Juan Drug Enforcement Administration (DEA) Agent Michael Cuento and two other agents arrived and questioned Fiore. Gipson was not questioned directly, but stood by and participated in the conversation. Fiore explained that she and Gipson had been staying and gambling at the El San Juan Casino property. When asked for identification, Fiore and Gipson showed their California drivers' licenses and stated that they had California residences, as well as residences in Las Vegas.[4] They further informed the DEA agents "that Las Vegas was the final destination of most if not all of the funds in their possession" and that they were returning to their Las Vegas residences. Agent Cuento escorted Gipson and Fiore to their plane and told them that they might be questioned further in Las Vegas. The two therefore called their attorneys in Las Vegas and arranged to meet them at the airport.

When they arrived at the Atlanta Hartsfield-Jackson International Airport for their connecting flight to Las Vegas, neither Gipson nor Fiore left the transit area near the departure gates. At their gate, DEA Agent Anthony Walden and another DEA agent approached Fiore and began questioning her.

---

[3]The first amended complaint notes that "Las Vegas [w]as the ordinary static place where [the 'traveling bank' was] situated."

[4]According to the complaint, Fiore's and Gipson's residences in Las Vegas are now their permanent residences.

Fiore said again that she was not carrying contraband, weapons, or drugs. She explained that she and Gipson were professional advantage gamblers[5] and that the money in their possession was their gambling bank and winnings. In addition, Fiore showed Walden her trip record,[6] which dated back to July 10, 2006, and listed casinos and gaming results. Gipson, sequestered from Fiore for questioning, explained that the documents evidencing that his trip was for gambling were in his checked bag.

After about ten minutes of questioning, another DEA agent arrived in the boarding area with a drug-detecting dog. The dog did not react to Fiore's carry-on bag but pawed Gipson's bag once. The agents informed Fiore and Gipson that the dog's reaction sufficiently signaled contraband to indicate that their money was involved in drug transactions and then seized *all* the funds that Fiore and Gipson had in their possession. Although Fiore and Gipson asked to be allowed at least taxi fare for their arrival in Las Vegas, the agents denied the request. Walden told Fiore and Gipson that if they later produced receipts showing the legitimacy of the funds, their money would be returned. With this understanding, Fiore and Gipson boarded their flight to Las Vegas. When they arrived in Las Vegas, Fiore and Gipson learned that their checked luggage also had been searched in Atlanta.

On August 30, 2006, and September 15, 2006, Fiore and Gipson sent Walden, from Las Vegas, various documents showing the legitimacy of their funds, including federal tax returns demonstrating that they were professional gamblers; the itinerary, hotel records, and receipts from their trip, which

---

[5]Fiore and Gipson's complaint states that they play "advantage gambling," meaning that they limit their play to legal games, such as poker, in which they have a statistical edge over the casino or other competitors because of their skill.

[6]The complaint explains that "[s]uch logs are kept by professional gamblers as support for tax purposes."

showed the legitimacy of their seized money; and a win record on El San Juan Casino letterhead stationery stating that Gipson left the hotel with over $30,000 in winnings immediately before leaving for Las Vegas via Atlanta. Fiore and Gipson asked that their money be returned to them as Walden had promised.

The funds, however, were not returned to Fiore and Gipson. Instead, the matter was forwarded to DEA headquarters in Virginia for additional investigation.[7] According to the complaint, the DEA's background searches on Fiore and Gipson showed them to be "squeaky clean." Nonetheless, according to the complaint, Walden and another DEA agent provided a false probable cause affidavit to the United States Attorney in the Northern District of Georgia, to assist in bringing a forfeiture action. Specifically, Fiore and Gipson allege in the complaint that this probable cause affidavit falsely stated that Gipson had been uncooperative and had refused to respond to questions; that Fiore and Gipson had given inconsistent answers during questioning; and that there was sufficient evidence for probable cause to forfeit the funds as drug proceeds. Also, according to the complaint, Walden left out exculpatory evidence he knew about when he submitted the affidavit: that Fiore and Gipson had no history of unlawful drug use or trade; that they had documentation showing them to be advantage gamblers; that their bags had passed through an agricultural x-ray and other inspections used for contraband detection without incident; that Fiore and Gipson had provided actual receipts for most of the funds that they carried; and that the $30,000 Gipson was carrying could be traced directly to a legal source, his winnings at El San Juan Casino.

---

[7]In his declaration, Walden states that after he seized the cash, he "immediately transferred [it] to a secure location designated to store seized cash" and that "[w]ithin approximately one hour of the seizure, [he] was no longer in possession of the seized cash . . . [and] did not possess the authority to return the cash" to Fiore and Gipson.

The case was referred to Assistant United States Attorney (AUSA) Dahil Goss. After determining that Walden had in fact omitted information, with the result that the probable cause affidavit he provided was misleading, Goss concluded that there was no probable cause for the forfeiture of the funds. Goss contacted Fiore and Gipson and offered to return their funds in exchange for a release, presumably of any possible legal claims, but they refused to execute one. Nonetheless, Goss directed the DEA to return Fiore and Gipson's money. The $97,000 was returned to them in Las Vegas on March 1, 2007, nearly seven months after the seizure at the Atlanta airport and six months after Fiore and Gipson had provided Walden with the requested documentation showing the legal source of their funds.

Fiore and Gipson brought a *Bivens* action in the District of Nevada against Walden and three other, unnamed DEA agents or attorneys[8] in their individual capacities, alleging that Walden and the other agents had violated their Fourth Amendment rights by: (1) seizing their money without probable cause; (2) continuing to hold the funds for nearly six months after receiving information conclusively demonstrating the legal source of the cash; (3) knowingly compiling a false and misleading probable case affidavit to support a forfeiture action; and (4) referring the matter to the United States Attorney for prosecution on the basis of deficient and/or falsified information, while willfully withholding known exculpatory information.

Walden moved to dismiss for lack of personal jurisdiction, under Fed. R. Civ. P. 12(b)(2), and for improper venue, under Fed. R. Civ. P. 12(b)(3). The district court determined that Walden's search of Fiore's and Gipson's bags and initial seizure of their funds occurred in, and was expressly aimed at, Georgia. Therefore, the district court concluded, there was not

---

[8]The unnamed DEA agents or attorneys were never served and are not appellants here.

personal jurisdiction over Walden in Nevada.[9] The district court did not separately consider whether Walden's actions regarding the allegedly false probable cause affidavit justified personal jurisdiction.

On appeal, Fiore and Gipson challenge dismissal of their case for lack of personal jurisdiction over Walden, the only defendant-appellee. They also argue that Nevada is the appropriate venue. We review de novo a district court's rulings on personal jurisdiction and improper venue. *Brayton Purcell*, 606 F.3d at 1127.

## II. DISCUSSION

### A. Personal Jurisdiction

[1] "'When subject matter jurisdiction is premised on a federal question, a court may exercise specific jurisdiction over a defendant if a rule or statute authorizes it to do so and the exercise of jurisdiction comports with the constitutional requirement of due process.' " *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1072 (9th Cir. 2001) (quoting *AT&T Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 589 (9th Cir. 1996)). Where, as here, there is no applicable federal statute governing personal jurisdiction, we look to the law of the state in which the district court sits. *See* Fed. R. Civ. P. 4(k)(1)(A).

[2] Nevada's long-arm statute permits personal jurisdiction over a defendant unless the exercise of jurisdiction would violate due process. *Myers*, 238 F.3d at 1072; *Trump v. Eighth Judicial Dist. Court*, 857 P.2d 740, 747 (Nev. 1993); Nev. Rev. Stat. 14.065(1). Our analysis therefore focuses exclusively on due process considerations. The due process analysis, in turn, centers on whether Walden has "certain minimum contacts" with Nevada, such that the exercise of jurisdiction

---

[9]The district court did not address venue.

"does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

Our court uses a three-part test (the *Schwarzenegger* test) for determining specific personal jurisdiction — that is, personal jurisdiction premised on the particular circumstances underlying the lawsuit sought to be litigated:[10]

> (1) The non-resident defendant must *purposefully direct his activities* or consummate some transaction *with the forum or resident thereof*; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's *forum-related activities*; and
>
> (3) the *exercise of jurisdiction* must comport with fair play and substantial justice, i.e. it *must be reasonable*.

*Schwarzenegger*, 374 F.3d at 802 (citation and internal quotation marks omitted) (emphases added).

## B. Operative Facts

In response to Fiore and Gipson's first amended complaint, Walden moved to dismiss for lack of personal jurisdiction and improper venue. His motion included a declaration stating

---

[10]There is no general jurisdiction over Walden, as he had no "continuous and systematic . . . contacts" with Nevada. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984); *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

that he was a police officer for the City of Covington, Georgia, and was deputized as a federal narcotics investigator assigned to the DEA Task Force Group 1 at the Atlanta airport. The purpose of the task force was to interdict illegal drugs, seize the drugs and any proceeds found, and prosecute individuals transporting illegal drugs or drug proceeds. Walden also stated that (1) he is a Georgia resident who had never resided, owned property, conducted business, or even been in Nevada; (2) he intercepted Fiore and Gipson at the Atlanta airport after he was informed by San Juan law enforcement officers that Fiore and Gipson had boarded a plane to Atlanta en route to their final destination, Las Vegas, Nevada; (3) when he asked plaintiffs for identification, they presented drivers' licenses that "were not issued by the State of Nevada"; (4) after the seizure, Walden and the other DEA agents "immediately transferred the seized cash to a secure location" for storage; (5) "[w]ithin approximately one hour of the seizure, [Walden] was no longer in possession of the seized cash"; and (6) Walden "did not possess the authority to return the cash to [Fiore and Gipson] once it was seized."[11] Walden stated that he seized the funds because of concern that Fiore and Gipson had approximately $97,000 in their possession and lacked sufficient documentation to substantiate the legitimacy of the funds. He further declared that he did not contact Fiore and Gipson's attorney or anyone else in Nevada to verify their explanations about the sources of the funds.

The district court did not conduct an evidentiary hearing regarding personal jurisdiction.[12] Consequently, "the plaintiff

---

[11]Federal regulations confirm that Walden did not have legal authority to return the money seized from Fiore and Gipson. *See* 21 C.F.R. §§ 1316.72-1316.73 (detailing requirements for storage of property "subject to seizure" and specifying Special Agents-in-Charge — not deputized local police such as Walden — as the officials "designated . . . to receive and maintain" seized property); *see* 21 C.F.R. § 1316.71(e) (defining "Special Agents-in-Charge" as DEA Special or Resident Agents-in-Charge and Federal Bureau of Investigation Special Agents-in-Charge).

[12]As far as appears in the record, Walden did not request an evidentiary hearing.

need only make 'a prima facie showing of jurisdictional facts to withstand the motion to dismiss.' "[13] *Brayton Purcell*, 606 F.3d at 1127 (quoting *Pebble Beach*, 453 F.3d at 1154). " '[U]ncontroverted allegations in plaintiff's complaint must be taken as true,' " *id.* (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002)) (alteration omitted), and, in deciding whether a prima facie showing has been made, "the court resolves all disputed facts in favor of the plaintiff." *Pebble Beach*, 453 F.3d at 1154. Nonetheless, "mere 'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007).

[3] In determining whether there is personal jurisdiction, we have drawn inferences from the facts alleged in the complaint, but have not expressly addressed the standard for doing so.[14] Other circuits have been more explicit than we have about the authority to draw reasonable inferences in favor of the plaintiff in determining whether the plaintiff has made a prima facie showing of personal jurisdiction over the defendant.[15] At the same time, the federal courts of appeal do not

---

[13]"If the plaintiff succeeds in meeting that prima facie burden, then the district court may still order an evidentiary hearing or the matter may be brought up again at trial." *Metropolitan Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064 n.1 (9th Cir. 1990).

[14]*See CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1111 (9th Cir. 2004) (holding that it is "reasonable to infer" that the defendant knew its actions "would resonate in Arizona" because it knew that plaintiff was based in Arizona); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1320 (9th Cir. 1998) (holding that licensing agreements and other documents with California companies "g[a]ve rise to a strong inference" that defendants conducted negotiations with California companies, possibly in California).

[15]*See Noonan v. Winston Co.*, 135 F.3d 85, 89 (1st Cir. 1998) ("Because the district court dismissed plaintiffs' claims without holding an evidentiary hearing, we review the rulings *de novo*, . . . construing all inferences in the plaintiffs' favor."); *New Wellington v. Flagship Resort Dev.*, 416

draw unreasonable or far-fetched inferences in favor of the plaintiff.[16]

[4] We agree with these various circuits regarding the standard for drawing inferences from the complaint when addressing personal jurisdiction questions: We will draw reasonable inferences from the complaint in favor of the plaintiff where

F.3d 290, 294 (4th Cir. 2005) ("[C]ourts 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.' " (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989))); *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 535 F.3d 1018, 1020 n.1 (7th Cir. 2009) ("In reciting the facts, we read the complaint liberally with every inference drawn in favor of plaintiff and resolve all factual disputes in favor of plaintiff.") ; *Steinbuch v. Cutler*, 518 F.3d 580, 585 (8th Cir. 2008) ("To survive a motion to dismiss, the plaintiff must state sufficient facts in the complaint to support a reasonable inference that defendants may be subjected to jurisdiction in the forum state."); *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) ("We accept factual allegations in the complaint as true to the extent that they are uncontested and, in cases of conflict, construe all reasonable inferences in the plaintiffs' favor."); *Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1338 (Fed. Cir. 2006) ("In reviewing the [personal jurisdiction] decision, we accept a plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in its favor.").

[16]*See Negron-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 23 (1st Cir. 2007) ("'[W]e caution that . . . the law does not require us struthiously to credit conclusory allegations or draw far-fetched inferences' " (quoting *Mass. Sch. of Law, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998))); *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502 (2d Cir. 1994) ("[W]e will not draw 'argumentative inferences' in the plaintiff's favor"); *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1018 (Fed. Cir. 2009) ("Although we must resolve factual conflicts in [plaintiff's] favor, it is entitled to only those inferences that are reasonable."); *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004) ("While a district court must resolve all factual disputes in favor of the plaintiff . . . 'the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.' " (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1984))).

personal jurisdiction is at stake, and will assume credibility. This approach is in line with the pleading standard set forth by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). *See id.* at 1949 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

**[5]** Here, the key facts in the complaint include Fiore and Gipson's statements that they are Nevada residents; that at the time the funds were seized, they both maintained residences in Las Vegas to which they were returning; and that Walden knew, at least by the time he wrote the probable cause affidavit, that the funds they had on their persons and in their carry on luggage while changing planes in Atlanta were legitimate proceeds of their gambling trade.

## C.  Application of the *Schwarzenegger* Test

Throughout the ensuing discussion, we concentrate on the false affidavit/forfeiture proceeding aspect of this case, because, as we explain below, we ultimately remand with respect to the initial search and seizure claim, for consideration of the application of the doctrine of pendent personal jurisdiction. *See Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004); pp. 17225-27, *infra*.

### 1.  Purposeful Direction

The first part of the *Schwarzenegger* test is subdivided into purposeful direction, which most often applies in tort cases, and purposeful availment, which most often applies in contract cases. 374 F.3d at 802; *see Pebble Beach*, 453 F.3d at 1155. Fiore and Gipson have alleged a tort action,[17] which calls for purposeful direction analysis.

---

[17]*Bivens* actions, like the one brought here by Fiore and Gipson, are constitutional tort claims against individual government officials. *See*

We analyze purposeful direction under the three-part test derived from *Calder v. Jones*, 465 U.S. 783 (1984), commonly referred to as the *Calder*-effects test. *See Brayton Purcell*, 606 F.3d at 1128; *see also Calder*, 465 U.S. at 788-91; *Schwarzenegger*, 374 F.3d at 803. Under the *Calder*-effect test, " 'the defendant allegedly must have [(a)] committed an intentional act, [(b)] expressly aimed at the forum state, [(c)] causing harm that the defendant knows is likely to be suffered in the forum state.' " *Brayton Purcell*, 606 F.3d at 1128 (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc)).

**[6]** "[D]ue process permits the exercise of personal jurisdiction over a defendant who 'purposefully directs' his activities at residents of a forum, even in the 'absence of physical contacts' with the forum." *Schwarzenegger*, 374 F.3d at 803 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (alteration omitted)). Intentional torts, in particular, can support personal jurisdiction over a nonresident defendant who has no other forum contacts. *Calder*, 465 U.S. at 790; *see also McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. ___, 2011 WL 2518811 at *4-5 (Jun. 27, 2011) (plurality opinion).

### a. Intentional Act

**[7]** The "intentional act" prong of the *Calder*-effects test is satisfied in this case, as the district court recognized. "We

---

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971); *see also Van Strum v. Lawn*, 940 F.2d 406, 408-10 (9th Cir. 1991) (holding that state personal injury statutes of limitations apply to constitutional tort claims brought under Bivens); *Arnold v. United States*, 816 F.2d 1306, 1311 (9th Cir. 1987) (holding that the plaintiff's *Bivens* claim failed because she alleged only state-law tort claims, not constitutional tort claims). We do not, of course, decide in this personal jurisdiction appeal any merits issues, including whether a *Bivens* action is available and whether any immunities apply.

construe 'intent' in the context of the 'intentional act' test as referring to an intent to perform an actual, physical act in the real world, rather than an intent to accomplish a result or consequence of that act." *Schwarzenegger*, 374 F.3d at 806. Submitting a false and misleading probable cause affidavit and referring the case for forfeiture proceedings in the absence of probable cause were intentional acts. *See, e.g., Bancroft & Masters, Inc v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000) (sending a letter was an intentional act).

### b.  Express Aiming

The "express aiming" prong of the *Calder*-effects test presents a more difficult question. The district court reasoned that "Walden's intentional act — the search of Plaintiffs' luggage and seizure of their currency — was expressly aimed at Georgia, not Nevada," because Walden's questioning of Fiore and Gipson, his search of their luggage and his seizure of their money all took place in Georgia. We may assume that is so. But, the district court, as noted, did not consider the false probable cause affidavit aspect of the case, as to which the express aiming prong, we conclude, is satisfied.

[8] In general, where there was "individual targeting" of forum residents — actions taken outside the forum state for the purpose of affecting a particular forum resident or a person with strong forum connections — we have held the express aiming requirement satisfied. *See Brayton Purcell*, 606 F.3d at 1129-31; *Pebble Beach*, 453 F.3d at 1157; *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002); *Bancroft & Masters*, 223 F.3d at 1087.[18] At the same time, the

---

[18]Even before *Bancroft & Masters*, the case that made explicit the express aiming prong of the *Calder*-effects test, *see* 223 F.3d at 1087, the case law in this circuit focused on individual targeting of those with known, significant connections to the forum. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (holding that personal jurisdiction existed where "[t]he brunt of the harm . . . was felt in California,"

express aiming requirement is not satisfied where it is merely foreseeable that there will be an impact on individuals in the forum. *Pebble Beach*, 453 F.3d at 1156; *Bancroft & Masters*, 223 F.3d at 1087; *Schwarzenegger*, 374 F.3d at 805.

In *Bancroft & Masters*, we explained that "[t]he presence of individualized targeting is what separates these cases from others in which we have found the effects test unsatisfied." 223 F.3d at 1088. In other words, the difference between those cases in which harm is merely foreseeable in the forum and those in which conduct is "expressly aimed" at the forum is often the difference between an *intended* impact that is either local or undifferentiated, and an *intended* impact that is targeted at a known individual who has a substantial, ongoing connection to the forum.

For example, the maintenance of a passive website did not satisfy the express aiming requirement, even though the website was viewed by forum residents, because there was no "individualized targeting" involved in "merely registering and operating a passive informational website." *Brayton Purcell*, 606 F.3d at 1130. Similarly, there was no express aiming in *Schwarzenegger*, which involved an Ohio car dealership's unauthorized use of Arnold Schwarzenegger's photograph in

and the defendant "knew Panavision would likely suffer harm there because, although at all relevant times Panavision was a Delaware limited partnership, its principal place of business was in California"); *Gordy v. Daily News, L.P.*, 95 F.3d 829, 833 (9th Cir. 1996) (finding personal jurisdiction where "[t]he prime targeting [arose] . . . from the fact that [plaintiff was] an individual who live[d] in California"); *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1259 (9th Cir. 1989) (holding that there was personal jurisdiction over a defendant who "knew the injury and harm stemming from his communications would occur in Arizona, where [plaintiff] planned to live and work); *Lake v. Lake*, 817 F.2d 1416, 1423 (9th Cir. 1987) (holding that personal jurisdiction existed where defendant "took . . . actions for the very purpose of having their consequences felt in the forum state" and where those actions "amount[ed] to more than . . . untargeted negligence").

local advertisements, none of which were circulated in California, the forum in which Schwarzenegger brought suit. 374 F.3d at 799-800. The "express aim was local," as the defendant intended the advertisement at issue to have only local effects. *Id.* at 807. The fact that the advertisement may have had forum effects, such as diminished compensation due to the "over-saturation of [Schwarzenegger's] image," *id.* at 800, was not sufficient to satisfy the express aiming prong. *Id.* at 807.

[9]  With respect to the allegedly false affidavit and referral for forfeiture proceedings, the indications that Walden was expressly targeting Fiore and Gipson in Nevada are strong. From the outset, Walden must have known and intended that his actions would have impacts outside Atlanta. Walden confronted Fiore and Gipson at their boarding gate for a plane to Las Vegas, after learning from agents in San Juan that they had just flown from there. So he knew that they were merely changing planes in Atlanta, not staying there. When Walden spoke to them, Fiore and Gipson evidenced no connections whatever to Georgia; they said they were going to Las Vegas, and showed California drivers' licenses. Thus, Walden expressly aimed his actions at people and property he knew from the outset were *not* local.[19] *See id.*

Moreover, on the complaint's allegations, Walden definitely knew, at some point *after* the seizure but *before* providing the alleged false probable cause affidavit, that Fiore and

---

[19]The DEA agents in San Juan had been told about plaintiffs' Nevada connections. Fiore and Gipson's complaint states that they

> volunteered that they had residences in Las Vegas (now their permanent residences) and California, truthfully provided [the DEA agent] with the additional information concerning their Las Vegas residences, and truthfully indicated that Las Vegas was the final destination of most if not all of the funds in their possession, the originating destination for a substantial part of the currency in their possession, and that they were returning to their residences in Las Vegas.

Gipson had a significant connection to Nevada. First, Fiore and Gipson's complaint states that "the funds were readily identifiable [as] originating and returning to Las Vegas as the ordinary static place where they were situated as plaintiffs' bank for gambling." The complaint then goes on to state that "Walden . . . told plaintiffs in no uncertain terms that if they later produced legal receipts demonstrating the legitimacy of the funds, the funds would be returned." Attempting to so demonstrate,

> [u]pon returning to their homes in Las Vegas, plaintiffs marshaled records within Las Vegas to comply with defendant's request and representation . . . On August 30, 2006, plaintiffs forwarded the following to Walden *from Las Vegas*: i. Copies of federal tax returns showing that each plaintiff made their living through gaming; ii. Receipts for their trip; iii. Travel itinerary for the trip; and iv. Hotel records showing that they gambled at such a high level that the casinos would provide them rooms on a complimentary (free) basis.

(emphasis added). At this point, the complaint alleges, "Walden necessarily recognized that in addition to a 'bank' held by Gipson for his seed money in gaming and necessarily originating in Nevada, the seized funds included at least $30,000.00 in cash received from legal gaming win[nings] in Puerto Rico." The complaint also alleges that "[a]ll defendants recognized at all times that the destination of the funds at the time of the seizure was Las Vegas, Nevada, and that a substantial amount of the currency had also originated at Las Vegas, Nevada."

[10] Finally, the complaint alleges that after Fiore and Gipson arrived in Las Vegas, "either Walden or Defendant C, with Walden's acquiessance [sic] and encouragement, searched data bases for background on plaintiffs including data bases compiled and maintained in Nevada," and that

"[t]hese searches indicated that the plaintiffs were 'squeaky clean.' " Moreover,

> [a]t the time that the probable cause affidavit was drafted, Walden and defendant C recognized that the funds were not subject to forfeiture and that they had authority and duty to return or cause the return of the seized . . . funds to plaintiffs in Las Vegas. . . [And] any reasonable officer acting in like or similar circumstances would have returned the seized funds to the plaintiffs in Las Vegas.

"Nevertheless, despite demand, despite knowledge of innocence, and despite the duty to return the funds, the funds were not returned to Las Vegas as required." Finally, according to the complaint, the funds ultimately were returned to Fiore and Gipson *in Las Vegas*, by the prosecutor to whom the case had been referred after Walden submitted the false affidavit. Taken together, these allegations indicate that at the time the assertedly false affidavit was composed and filed, Walden recognized that the plaintiffs had significant connections to Nevada, particularly with respect to the funds for which forfeiture was being sought.

For the purposes of personal jurisdiction, it does not matter whether Fiore and Gipson were legal residents of Nevada or whether they simply had a significant connection to the forum, such that Walden's actions were " 'performed with the purpose of having' its 'consequences felt' by someone in [Las Vegas]." *Ibrahim v. Dep't Homeland Sec.*, 538 F.3d 1250, 1259 (9th Cir. 2008); *see also Brainerd*, 873 F.2d at 1259. *Ibrahim*, for example, concerned a woman from Malaysia who had studied at Stanford but was leaving, permanently, on the day of the incident that gave rise to the lawsuit. 538 F.3d at 1253. The defendant, a resident of Virginia who had no ties to California, had from the Transportation Security Intelligence Service's office in Washington, D.C., instructed San Francisco police to detain Ibrahim after her name appeared on

the federal government's No-Fly List. *Id.* at 1253, 1258. We held the purposeful impact on Ibrahim in San Francisco sufficient to establish personal jurisdiction over the out-of-state defendant, because it was apparent to the defendant that his order's consequences would be felt in San Francisco. *Id.* at 1258-59. This was so even though the defendant did not initiate the phone call that resulted in him instructing the police in San Francisco to detain Ibrahim. *Id.* at 1258. Whether Ibrahim was a California resident at the time of her detention was not discussed in the case, indicating that her residence did not matter.

Similarly, in *Brainerd*, a defamation case, Brainerd, the plaintiff had accepted a tenured position with the University of Arizona, after which the defendant made defamatory statements about him to his new employer. 873 F.2d at 1258. Whether Brainerd was an Arizona resident at the time the defamatory statements were made was not a factor in the opinion's analysis. Instead, Brainerd's known connection to Arizona was sufficient to establish personal jurisdiction in Arizona over the defendant, a resident of Canada whose only contacts with Arizona consisted of communications with the University of Arizona regarding the plaintiff. *Id.* at 1258-59. The defendant "knew the injury and harm stemming from his communications would occur in Arizona, where Brainerd *planned* to live and work." *Id.* at 1259 (emphasis added).

In this case, the allegations in the complaint, taken as true for these purposes, establish that Walden necessarily recognized, at least by the time he wrote the probable cause affidavit, that the plaintiffs had a connection to Nevada that was at least as strong as in *Ibrahim*, in which the plaintiff left the forum state the day after the incident giving rise to the suit, never to return, 538 F.3d at 1253, or in *Brainerd*, where the plaintiff only *planned* to live and work in the forum where the injury occurred. 873 F.2d at 1259.

[11] Thus, whether Fiore and Gipson were residents of Nevada at the time of the filing of the false probable cause

affidavit is not determinative of the question of personal juris-
diction over Walden. Moreover, as in *Ibrahim* and *Brainerd*,
it is not relevant who *initiated* the contacts with Nevada. *See
Ibrahim*, 538 F.3d at 1258-59; *Brainerd*, 873 F.2d at 1259.
Instead, the critical factor is whether Walden, knowing of
Fiore and Gipson's significant connections to Nevada, should
be taken to have intended that the consequences of his actions
would be felt by them in that state.

As to that issue, our precedents regarding personal jurisdic-
tion in cases concerning fraud or similar causes of action are
informative. That case law firmly establishes that if a defen-
dant is alleged to have defrauded or similarly schemed against
someone with substantial ties to a forum, the "expressly
aimed" factor is met, even if all the defrauding activities
occur outside the forum.

In *Bancroft & Masters*, for example, the defendant, a com-
pany based in Georgia, sent a letter to the company in Vir-
ginia that is the sole registrar of domain names in the United
States, allegedly for the purpose of misappropriating a Cali-
fornia company's domain name for its own use. 223 F.3d at
1087. This court held that the letter, sent from Georgia to Vir-
ginia, "was expressly aimed at California because it individu-
ally targeted [plaintiff], a California corporation doing
business almost exclusively in California" and "the effects of
the letter were primarily felt, as [defendant] knew they would
be, in California." *Id.* at 1088.

Similarly, *Metropolitan Life,* decided before this court
explicitly adopted the "express aiming" analysis, held that
personal jurisdiction existed in California over Geneva Gam-
brell, an Alabama resident who purposefully defrauded James
Neaves, a California resident, by sending a letter to an insur-
ance company representing that Gambrell was entitled to a
payment that she knew actually belonged to Neaves. *Id.* at
1064-65. Gambrell sent the letter to the insurance company in
California, rather than mailing it to the company's headquar-

ters in New York, but the court explained that the location to which the letter was mailed did not matter. *Id.* at 1065. What mattered, instead, was that in "address[ing] the envelope to Metropolitan, she was purposefully defrauding Neaves in California." *Id.*

The situation here is similar to those in *Bancroft & Masters* and *Metropolitan Life*. The complaint alleges that Walden fraudulently executed a false and misleading probable cause affidavit, used it to encourage the U.S. Attorney in Georgia to prosecute a forfeiture action, and thereby sought to obtain the funds for the Atlanta DEA.[20] These allegations are analogous to an allegation that Walden attempted to defraud Fiore and Gipson of the seized funds. *See Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1155 (9th Cir. 2005) (listing the elements of fraud under Nevada law). According to the complaint, Walden falsely and with misleading omissions represented in the probable cause affidavit that the Atlanta DEA was entitled to the funds he knew rightfully belonged to Fiore and Gipson, whom he knew had a significant connection to Nevada. And the fraudulent execution of the probable cause affidavit was intended to assist in the retention and eventual forfeiture of Fiore and Gipson's funds, actions which, Walden knew, would have their consequences felt in Las Vegas, *see Ibrahim*, 538 F.3d at 1259, the location to which he knew the funds should rightfully have been returned. Moreover, after Fiore and Gipson forwarded all of their documentation, Walden likely knew, if he did not know before, that Fiore and Gipson were professional gamblers with significant ties to Nevada and that seizing and attempting to keep their "bank" and their earnings would disrupt their business activities in Nevada. *See Bancroft & Masters*, 223 F.3d at 1087 (holding that the express aiming requirement was satisfied when defen-

---

[20]Had the forfeiture action been successful, the funds would have been transferred "to any Federal agency or to any State or local law enforcement agency which participated directly in the seizure or forfeiture of the property." 21 U.S.C. § 881(e)(1)(A).

dant sent a letter to a company in Virginia with the alleged intent and result of disrupting the plaintiff's California business).

In sum, with regard to the filing of the false probable cause affidavit, Walden individually targeted Fiore and Gipson, as he was aware of their significant connection to Nevada and of the likely impact of his defrauding actions on their property and business in Nevada. Under our case law, these facts satisfy the express aiming prong of the *Calder*-effects test.

### c.    Foreseeable Harm

**[12]** The final prong of the *Calder*-effects test is the requirement that the conduct at issue caused foreseeable harm in the forum. We "do[ ] not require that the 'brunt' of the harm be suffered in the forum." *Brayton Purcell*, 606 F.3d at 1131 (quoting *Yahoo!*, 433 F.3d at 1207). Instead, the foreseeable-harm "element is satisfied when defendant's intentional act has 'foreseeable effects' in the forum." *Id.* "If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Yahoo!*, 433 F.3d at 1207.

**[13]** The foreseeable harm factor, thus understood, is readily satisfied here. During their initial encounter, Walden knew from their plane tickets, and from the San Juan DEA agent, that Fiore and Gipson were heading to Las Vegas, along with their $97,000. Moreover, Fiore and Gipson had explained at the airport that they were professional gamblers, and Fiore provided some documentation regarding her funds. After arriving in Nevada, Fiore and Gipson provided additional documentation of the legitimacy and sources of the funds. Consequently, Walden knew, by the time he wrote the fraudulent probable cause affidavit, that the money seized represented their professional earnings. The documentation also demonstrated that he had seized their $30,000 "bank," which

they needed to pursue their trade in Nevada. Although the funds were eventually returned to Fiore and Gipson, it is a fair inference from the complaint that the return was delayed while the prosecutor considered whether to go forward with a forfeiture action on the basis of the false probable cause affidavit and sought, unsuccessfully, to forestall a lawsuit such as this one through execution of a release. The delay in returning the funds to Fiore and Gipson in Las Vegas caused them foreseeable harm in Nevada.

\* \* \*

**[14]** Taken as a whole, then, Fiore and Gipson's complaint satisfies the *Calder*-effects test. The complaint's allegations establish that, by falsifying the probable cause affidavit and attempting to secure permanently for the Atlanta DEA the seized funds, Walden committed (a) intentional acts that (b) individually targeted Fiore and Gipson in Nevada, and thus were expressly aimed at Nevada, and (c) caused foreseeable harm in Nevada. "An individual injured in [Nevada] need not go to [Georgia] to seek redress from persons who, though remaining in [Georgia] knowingly cause[d] injury in [Nevada]." *Calder*, 465 U.S. at 790. Accordingly, Fiore and Gipson have made a prima facie showing of purposeful direction. *See Brayton Purcell*, 606 F.3d at 1128-31.

## 2. Forum-Related Conduct

We turn to the second part of the *Schwarzenegger* test: forum-related conduct. 374 F.3d at 802.

This circuit "follows the 'but for' test" to determine forum-related conduct. *Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (quoting *Myers*, 238 F.3d at 1075). Fiore and Gipson must show that they would not have suffered the alleged injuries in Nevada "but for" Walden's false probable cause affidavit and attempt to facilitate a forfeiture prosecution. *See*

*id.* As in *Menken*, the standard is "easily met" here. *Id.* at 1059.

**[15]** Fiore and Gipson have alleged that they would not have been deprived of their "bank" and the proceeds of their gambling trip for nearly seven months *but for* the seizure of *all* of their money in Atlanta, combined with Walden's actions that helped delay the return of the funds. Had Walden not filed the false probable cause affidavit, one can infer, the funds would have been returned considerably sooner. The forum-related conduct factor is therefore present.

### 3.   Reasonableness Determination

**[16]** As Fiore and Gipson have met their burden of satisfying the first two parts of the *Schwarzenegger* test for establishing personal jurisdiction in Nevada, the burden shifts to Walden to satisfy the third part — " 'present[ing] a compelling case' that the exercise of jurisdiction would not be reasonable" in Nevada. *Menken*, 503 F.3d at 1057 (quoting *Schwarzenegger*, 374 F.3d at 802). To determine reasonableness, we balance seven factors:

> [(a)] the extent of the defendants' purposeful interjection into the forum state's affairs; [(b)] the burden on the defendant of defending in the forum; [(c)] the extent of conflict with the sovereignty of the defendants' state; [(d)] the forum state's interest in adjudicating the dispute; [(e)] the most efficient judicial resolution of the controversy; [(f)] the importance of the forum to the plaintiff's interest in convenient and effective relief; and [(g)] the existence of an alternative forum.

*Id.* at 1058 (quoting *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004)).

### a. Extent of Purposeful Interjection into Affairs of Forum State

Regarding the first factor, Walden argues that because the initial search and seizure occurred in Georgia, his actions did not inject him into the affairs of Nevada. We have recognized that circumstances may exist where "the level of purposeful injection into the forum supports a finding of purposeful availment yet still weighs against the reasonableness of jurisdiction." *Dole Food*, 303 F.3d at 1115. But that hypothetical situation does not exist here.

When Walden sought out Fiore and Gipson at their boarding gate at the Atlanta airport, he knew that their presence in Georgia was fleeting, and that they were going to Nevada. Without probable cause, he seized all of Fiore and Gipson's money, approximately $97,000, which also was destined for Nevada. Even if Walden did not know at the time he seized the funds that Fiore and Gipson had ongoing, substantial connections to Nevada, he necessarily learned of these connections at some point before providing the alleged false probable cause affidavit and referring the case for forfeiture proceedings.

**[17]** As it turned out, the impact of the intentional torts alleged, which involved taking a large sum of money from Fiore and Gipson, would necessarily have their primary impact where the funds were meant to be kept and used, Nevada. As an airport law enforcement officer, Walden was necessarily aware that his actions would often have their principal impact outside of Georgia, as many of the people he investigates are in Atlanta only on their way to somewhere else.[21]

---

[21]The Atlanta airport is a major transportation hub. A fact sheet published by the airport states that, since 1998, the Atlanta airport has been the busiest passenger airport *in the world*, with an average of more than 240,000 passengers a day. *See Fact Sheet,* Hartsfield-Jackson Atlanta Int'l Airport (2011), available at http://www.atlanta-airport.com/Passenger/pdf/

In that sense, Walden's job necessitates regularly interjecting himself into affairs of other jurisdictions. By preventing the $97,000 from reaching the intended destination, Nevada, Walden prevented Fiore and Gipson from using their legitimate earnings there, and deprived Nevada banking and the Nevada tax base of the money for a considerable time. In short, although he never stepped foot in Nevada, Walden's " 'purposeful interjection into [Nevada] was significant.' " *Ibrahim*, 538 F.3d at 1259 (quoting *Ziegler v. Indian River County*, 64 F.3d 470, 475 (9th Cir. 1995)).

### b.   Burden of Defending in the Forum

Concerning the second factor, Walden maintains that he would be burdened because he has never resided, visited, owned property, or conducted business in Nevada. Were Walden a local small business person or an airport employee, his argument might well have force. But in fact, Walden was working as a federal law enforcement officer, which is the only reason he could seize the funds or seek to facilitate their forfeiture.

When federal employees are sued under *Bivens*, the government, as a rule, provides for their defense, and, ultimately, indemnifies them. *See* 28 C.F.R. § 50.15. As Fiore and Gipson pointed out in their brief to this court, Walden appeared in Nevada "represented by the world's largest law firm with offices in all fifty states and providing defense free of charge (The Office of the United States Attorney)." On appeal, Walden is represented by the appellate staff of the Civil Division

---

Fact_Sheet_2011.pdf (last viewed Jul. 13, 2011). In August 2006, the month Fiore and Gipson transferred planes in Atlanta, more than 3.6 million passengers took flights arriving at the Atlanta airport, and approximately the same number boarded flights leaving the Atlanta airport. *See Monthly Airport Traffic Report*, Dep't of Aviation, Hartsfield-Jackson Atlanta Int'l Airport (Aug. 2006), available at http://www.atlanta-airport.com/docs/Traffic/200608.pdf (last viewed Jul. 13, 2011).

of the Department of Justice in Washington, D.C., which often appears in this court. Fiore and Gipson, in contrast, had to retain counsel to seek redress for their alleged constitutional injuries. Walden's burden in defending this case is thus small as compared to the likely burden on Fiore and Gipson were the case brought in Georgia. This factor therefore does not weigh in favor of Walden, although it would in all probability weigh in favor of many airport-connected defendants not associated with the federal government.

### c. Extent of Conflict with Sovereignty of Defendant's State

The third factor, the extent of conflict with the sovereignty of Georgia, favors Fiore and Gipson. This is a federal action that will be resolved in federal court. The federal government, not Georgia, was the entity on whose behalf the funds were seized and retained. And as Fiore and Gipson have no connection to Georgia, Goergia has no interest in protecting their interests. Consequently, redress of Walden's tortious conduct that injured Nevada residents in Nevada will not "infringe on the sovereignty of [Walden's] home state of [Georgia]." *Ibrahim*, 538 F.3d at 1259.

### d. Interest of Forum State in Adjudicating the Dispute

[18] Nevada has " 'a strong interest in providing an effective means of redress for its residents who are tortiously injured.' " *Id.* (quoting *Ziegler*, 64 F.3d at 475). Fiore and Gipson are Nevada residents; a substantial portion of their $97,000 that Walden seized originated in Nevada; the money was en route to Nevada when seized; the seized money was destined to enter Nevada's economy and tax base; the money eventually was returned to Fiore and Gipson in Las Vegas, Nevada; and Fiore and Gipson have incurred considerable attorneys' fees in Nevada in securing the return of their unlawfully seized, legitimate earnings and in filing this action

to redress the financial injuries they suffered in Nevada. For all these reasons, Nevada has a considerable interest in adjudicating this dispute. *See id.*

### e.  Most Efficient Resolution of the Controversy

The fifth factor concerns efficiency of the forum, a consideration that turns primarily on the location of witnesses and evidence. *See Menken*, 503 F.3d at 1060-61. Fiore and Gipson represent that their witnesses likely will include: three people from San Juan, Puerto Rico; three from Atlanta, Georgia; one from Quantico, Virginia; and at least Fiore and Gipson from Las Vegas, Nevada. If Walden places at issue Fiore's and Gipson's reputations as proficient, practicing gamblers, additional Nevada witnesses likely will be necessary.

Fiore and Gipson also emphasize that their documentation was generated in and is located in Nevada. These documents, including voluminous records sent to Walden from Nevada, which evidence that Fiore and Gipson are professional gamblers and that the cash in their possession, unremarkable given their trade, did not provide probable cause for Walden's continued seizure and attempted forfeiture of their funds. Moreover, Fiore and Gipson argue that most of the documentation relevant to Walden's actions is located in the Department of Justice in Washington, D.C., in the DEA headquarters in Quantico, Virginia, or in Nevada, not in Georgia.

In contrast, Walden argues only that the witnesses in Georgia are the most important, that the "operative versions" of Fiore and Gipson's documents are "those received by DEA in Georgia."

Overall, this factor is fairly evenly balanced, weighing, if at all, only slightly in favor of Fiore and Gipson.

### f. Importance of Forum to Plaintiffs' Convenient and Effective Relief

The sixth factor, the importance of Nevada to Fiore and Gipson's convenient and effective relief, generally is not given much weight in this circuit. *See Dole Food*, 303 F.3d at 1116 (noting that "in this circuit, the plaintiff's convenience is not of paramount importance"). It does, however, weigh in Fiore and Gipson's favor. Fiore and Gipson are Nevada residents; the seizure of their gambling proceeds by Walden occurred as they were changing planes in Georgia, a state to which they appear to have had no other connection. All of their financial injury was realized in Nevada, which is also the location of their documentation. Fiore and Gipson also have a continuing relationship with a Nevada law firm. For all these reasons, Nevada is a convenient and effective forum for them.

### g. Existence of an Alternative Forum

For the reasons given in evaluating the preceding six factors, although Georgia is an available forum in the sense that the suit against Walden could have been brought there, Georgia is not a preferable alternative to Nevada. In addition, at this preliminary stage of proceedings, the parties have not had the benefit of discovery to identify the other DEA employee who made relevant decisions regarding the false affidavit and attempt to instigate forfeiture proceedings while retaining the seized funds. According to the complaint, that individual operated from Virginia. As to him or her, Georgia might not be an available forum, but Nevada would be, for the same reason it is a proper forum for suit against Walden.

* * *

**[19]** Taken as a whole, the seven-factor reasonableness analysis disfavors Georgia as a forum, and, overall, mildly favors Nevada. Walden has not come close to making a "com-

pelling case" that exercise of jurisdiction over him in Nevada would be unreasonable. *See Schwarzenegger*, 374 F.3d at 802.

### 4. Conclusion

Due process is met when there is " 'a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The actions related to the false probable cause affidavit satisfy the express aiming prong, as well as the other requirements for personal jurisdiction. Under *Calder* and *Schwarzenegger*, it is reasonable and comports with traditional notions of fair play and substantial justice for Fiore and Gipson to call Walden to answer in Nevada for those deliberate actions.

That is not to say, and we are not holding, that intentional tortious conduct aimed at a person where he or she is in transit at an airport is sufficient, standing alone, to confer personal jurisdiction over an airport-connected official or employee. In this case, Walden did much more: He individually targeted Fiore and Gipson in Nevada by creating a false and misleading probable cause affidavit and thus illegally seeking to foster the forfeiture of the funds to benefit the Atlanta DEA. His conduct in doing so was expressly aimed at Nevada because at that point, if not before, he knew that Fiore and Gipson had ongoing and substantial connections to Nevada. If, as alleged, he also knew that there was no legitimate reason to seek forfeiture of the funds, his actions amounted to an attempt to defraud Nevada residents. Moreover, the traditional weight given to a defendant's inconvenience in having to litigate in a forum in which he has few contacts does not apply in this case, given that Walden can be represented just as easily by the United States Attorney's Office in Nevada as by the Office in Georgia.

**[20]** Under these circumstances, the district court erred in concluding that it lacked personal jurisdiction over Walden, at least as to the portion of Fiore and Gipson's complaint pertaining to the false probable cause affidavit and resulting delay in returning the funds.

## C.   Pendent Personal Jurisdiction

Under our case law, the district court may exercise pendent personal jurisdiction over the remainder of Fiore and Gipson's claims even if there would not be personal jurisdiction over them standing alone. *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004). *Action Embroidery* was the first case in this court adopting the doctrine of pendent personal jurisdiction, *id.* at 1181, under which "a court may assert . . . jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Id.* at 1180. The facts underlying a particular claim need not exactly track the facts underlying the claims for which there is personal jurisdiction, so long as the core facts are the same. *See CE Distrib.*, 380 F.3d at 1113-14.[22]

Here, the core facts of all of Fiore and Gipson's claims arise out of the same incident: Walden's seizure of their funds at the Atlanta airport. When he seized their funds, Walden knew that Fiore and Gipson were traveling to Las Vegas and that they had no connection to Georgia beyond their transit through the airport. Walden first individually targeted Fiore and Gipson when he confronted them at their gate as they

---

[22]In *CE Distribution*, this court approvingly cited a Seventh Circuit opinion, *Channell v. Citicorp Nat'l Svcs., Inc.*, 89 F.3d 379, 385 (7th Cir. 1996), which noted that only a "loose factual connection between the claims" is necessary for the purposes of pendent jurisdiction. *CE Distrib.*, 380 F.3d at 1114.

were about to board, and the funds then seized were the same funds as to which forfeiture was sought through the submission of the false affidavit. Further, and critically, the false affidavit was false — or not — in its description of the events at the Atlanta airport surrounding the seizure. So the same facts will have to be developed with regard to the search and seizure and false affidavit claims. Consequently, even if those facts are not sufficient independently to give rise to personal jurisdiction over Walden for the initial seizure, they weigh strongly in favor of the exercise of pendent personal jurisdiction.

In *Action Embroidery*, this court accepted for purposes of the appeal the defendant's contention that there was no personal jurisdiction over state-law claims standing alone, but held that the district court could exercise pendent personal jurisdiction over them. 368 F.3d at 1180. We follow the same course here and remand to the district court "to decide whether to retain or dismiss the pendent [search and seizure] claims." *Id.* at 1181.

## D.  Venue

Although Walden raised the defense of improper venue in the district court, the issue was not addressed once the court determined that there was no personal jurisdiction over Walden in Nevada. Because we have concluded otherwise, we also consider his defense of improper venue, which he pursues on appeal.

The controlling statute provides in relevant part: "A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . *a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.*" 28 U.S.C. § 1391(b)(2) (emphasis added). Walden contends that Nevada is an improper venue for this action

because it has no relationship to the event about the seizure of Fiore and Gipson's $97,000 at the Atlanta airport.[23]

"[I]n a tort action, the locus of the injury [is] a relevant factor" in making this determination. *Myers*, 238 F.3d at 1076. In *Myers*, the fact that "at least one of the 'harms' suffered by Plaintiffs . . . was felt in Nevada" was sufficient to make venue proper in Nevada. *Id.* Fiore and Gipson similarly suffered harm in Nevada. All the economic injuries suffered by Fiore and Gipson were realized in Nevada, including their loss of use and interest on the funds for nearly seven months.

---

[23]Walden relies on *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979), and *Sutain v. Shapiro & Lieberman*, 678 F.2d 115 (9th Cir. 1982) in arguing that Fiore and Gipson cannot establish venue under 28 U.S.C. § 1391(b)(2). Both of these cases, however, addressed § 1391(b) as it read before amendments contained in the present version. Those amendments changed language that had limited venue to districts "in which the claim arose," to provide that venue lies where "a substantial part of the events or omissions giving rise to the claim occurred." We have recognized this distinction and noted that *Leroy* no longer can be used as Walden maintains. *Newton v. Thomason*, 22 F.3d 1455, 1464 & n.8 (9th Cir. 1994). Moreover, in *Sutain*, the only event that occurred in the forum in question was the appearance of a partner of the defendant accounting firm in Tax Court, in response to a subpoena. 678 F.2d at 117. That such an event was "not 'substantial' for the purposes of" establishing venue, *id.*, does not undermine our conclusions in this case.

Walden also urges us to rely on *Stafford v. Briggs*, 444 U.S. 527 (1980), which held that 28 U.S.C. § 1391(e), addressing venue in civil actions against officers of the United States acting in their official capacity, could not be read to allow suits against individual officers for money damages to go forward in any federal district in the country because to do so "would place federal officers . . . in a very different posture in personal damages suits from that of all other persons." *Id.* at 544. Walden's argument that finding venue proper in Nevada in this case would similarly result in a precedent that allowed any law enforcement officer working in a transportation hub to be sued in any forum in the country is contradicted by our earlier analysis regarding personal jurisdiction. Moreover, Fiore and Gipson do not maintain, and we are not holding, that law enforcement officers who work at transportation hubs are subject to nationwide venue because of their status. For venue to lie, the terms of § 1391(b)(2) must be met, as they are in this case.

The facts concerning the origin and legitimacy of the $97,000 are also connected to Nevada: The $30,000 "bank" originated in Nevada; Walden fabricated a fraudulent probable cause affidavit to institute forfeiture proceedings against Fiore and Gipson after they had returned to their residences in Nevada, which affected them there; the documentation of the legitimacy of the money was sent from Nevada; and the funds eventually were returned to Fiore and Gipson in Nevada, verifying the lack of probable cause for forfeiture. The arrival of the funds in Nevada was the event that caused Fiore and Gipson's cause of action to mature, because their case was not ripe until the government abandoned the forfeiture case against them. *See Albright v. Oliver*, 510 U.S. 266, 280 (1994) (Ginsburg, J., concurring). Taking all these events together, "a substantial part of the events or omissions giving rise to the claim occurred" in Nevada. 28 U.S.C. § 1391(b)(2). Venue is proper in the District of Nevada.

## III.   CONCLUSION

**[21]** Walden seized all of the large amount of money Fiore and Gipson were carrying with them as they travelled from San Juan to Las Vegas via Atlanta. Although Fiore and Gipson sent Walden, from Nevada, documentation establishing the legitimate sources of their funds, he persisted in seeking forfeiture of their money. Walden's intentional acts with regard to the false probable cause affidavit and the consequent delay in returning their money were expressly aimed at Nevada and so satisfy the requirements for personal jurisdiction. As to the search and seizure claim, we are remanding it to the district court for the exercise of discretion with regard to pendent personal jurisdiction. We also hold that venue is proper in the District of Nevada.

**REVERSED and REMANDED.**

IKUTA, Circuit Judge, dissenting:

Gambling, it is said, is a "sure way of getting nothing from something." Here, by contrast, two professional gamblers get something from nothing. Although their complaint contains nothing that would provide a basis for asserting personal jurisdiction over the federal agent who allegedly violated their Fourth Amendment rights, the majority finds "something" in the complaint: specifically, the "false affidavit/forfeiture proceeding *aspect*" of their case. Maj. op. at 17206 (emphasis added). This "aspect," the majority determines, provides a basis for personal jurisdiction over the federal agent, even though it is neither a constitutional tort nor a state law claim, and even though plaintiffs never argued that it was. And the gamblers' lucky streak does not end there: the majority then reverses the district court for failing to discern this elusive "aspect" and to apply the entirely discretionary (and rarely invoked) doctrine of "pendent personal jurisdiction." In fact, the district court correctly determined that the complaint did not make a prima facie showing that the federal agent purposefully directed his actions to the forum state. Because the district court did not err in dismissing the complaint for want of personal jurisdiction, I dissent.

I

The complaint in this case relates the following tale. Gina Fiore and Keith Gipson are professional gamblers. On their return from a gambling trip to San Juan, Puerto Rico, their "traveling bank"[1] and winnings had grown to over $97,000, which they divided between their carry-on bags and their pockets. At the San Juan airport, TSA agents searched Gipson's bag and found about $50,000. The agents also discovered about $30,000 in Fiore's carry-on. Upon spotting such

---

[1]A "traveling bank" is a significant amount of currency (here, tens of thousands of dollars) carried by professional gamblers to cover traveling expenses and give them a cushion if they suffer losses.

large sums of cash, the TSA agent called a supervisor, who contacted DEA agent Michael Cuento and two others.

Fiore told Cuento that she and Gipson had departed from the El San Juan Casino, where they had been gambling. Fiore and Gipson showed Cuento valid California driver's licenses, volunteered that they had Nevada and California residences, and indicated that they were returning to their residences in Las Vegas. Cuento escorted them onto the plane, but he told them they should not be surprised if they were asked further questions.

Fiore and Gipson landed in Atlanta and proceeded to their gate for their connecting flight to Las Vegas. There, they met agent Walden and another DEA agent who called for a drug-sniffing dog. Fiore and Gipson were (falsely, they say) informed that the dog had alerted. Agent Walden seized their cash, but assured them that if they produced receipts demonstrating that the funds were legitimate, their money would be returned. With that assurance, plaintiffs boarded their plane to Las Vegas. From the fact that their checked bags did not make it to Las Vegas with the plane, the disheveled state of the items inside, and the absence of a TSA sticker, plaintiffs surmised that the DEA, with the participation of agent Walden, conducted a search of their checked baggage.

Upon their return, Fiore and Gipson forwarded to Walden tax returns, receipts from their trip, their travel itinerary, and hotel records showing that they had gambled enough to have rooms "comped." They explained that Gipson had played under a legal alias he commonly used in gaming. They also sent a "win record" on El San Juan letterhead. Despite, as plaintiffs allege, "necessarily recogniz[ing] that the seized funds were not related to any illicit drug trade and were not contraband or the proceeds of contraband," Walden did not return their funds. Not only that, but they allege "on information and belief" that Walden, along with two unnamed defendants, worked "to provide a false probable cause affidavit,

known by each to be false, for forwarding to the U.S. attorney in Georgia to prosecute a forfeiture action," an affidavit that Fiore and Gipson contend omitted exculpatory information.

Even though Walden necessarily recognized the funds' legitimacy, plaintiffs allege, he did not return the funds and referred the matter for prosecution because he "personally disapproved" of the strategies plaintiffs used in gambling.[2] The AUSA to whom the matter was referred ultimately ordered the funds returned some six months later for lack of probable cause.

If plausible, this story might support Fiore and Gipson's claim that Walden seized their traveling bank in violation of their Fourth Amendment rights. But there is one problem: Fiore and Gipson filed the complaint against Walden in a district court in Nevada, but failed to allege that Walden had *any* contacts with that state for purposes of personal jurisdiction. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (personal jurisdiction cannot constitutionally be asserted unless defendant has "certain minimum contacts with [the forum State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' " (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))). Notably absent from plaintiffs' complaint is any allegation:

- that plaintiffs told Walden of their Las Vegas residences;

- that Cuento ever spoke with Walden;

- that Cuento told Walden of plaintiffs' connection to Las Vegas;

---

[2]Walden's uncontested declaration, by contrast, states that he lacked any authority over the seized cash once it had been transferred to a secure location for processing and storage.

• that plaintiffs showed Walden any Nevada-issued identification (in fact, Agent Walden's uncontested declaration confirms that Fiore and Gipson showed him California, not Nevada, licenses);

Indeed, the complaint does not expressly allege that even *after* the seizure, Walden became aware that plaintiffs' residence was in Nevada; it alleges only that plaintiffs forwarded their tax returns, trip receipts, and the like to Walden "from Las Vegas." And Walden's uncontested declaration makes clear that he never contacted plaintiffs' attorney "or anyone else in Nevada," and has never lived in, been to, owned property or conducted any business in Nevada.

Given these facts, and applying the applicable precedent, *see Calder v. Jones*, 465 U.S. 783 (1984); *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004), the district court concluded that Walden's search of plaintiffs' luggage and seizure of the money "was expressly aimed at Georgia, not Nevada": the search occurred in Georgia, as did the questioning and the seizure. It therefore dismissed plaintiffs' action for want of personal jurisdiction. As explained below, the district court's thorough and well-reasoned decision was clearly correct.

## II

For a court to have specific personal jurisdiction over a defendant in a tort suit, (1) the defendant must have purposefully directed specific activities toward the state forum, (2) the plaintiff's claim must arise out of or relate to those specific forum-related activities, and (3) the exercise of jurisdiction must comport with "fair play and substantial justice." *Schwarzenegger*, 374 F.3d at 802; Fed R. Civ. P. 4(k)(1)(A). In other words, in order for the district court to have asserted personal jurisdiction over Walden, it would have had to conclude that Walden purposefully directed the actions that form the basis of plaintiffs' claim to Nevada.

In determining whether the defendant "purposefully directed" the activities which are the subject of plaintiff's claim to the forum state, we consider whether the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Calder v. Jones*, 465 U.S. at 788-89). As a matter of simple logic, a defendant cannot "expressly aim" an intentional act at a victim's home state if the defendant committing the action does not even know that the victim has any connection with that state. *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir. 2000) ("From the available cases, we deduce that the ['express aiming'] requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state."); *cf. Ibrahim v. Dep't of Homeland Sec.*, 538 F.3d 1250, 1258 (9th Cir. 2008) (approving the exercise of personal jurisdiction in California where defendant, a Virginia resident with no other ties to California, ordered local police to prevent plaintiff from flying out of the San Francisco airport and to detain her for further questioning).

This framework creates a problem for Fiore and Gipson: when Walden seized the cash, he knew only that the plaintiffs had California driver's licenses and were headed to Las Vegas. The complaint does not even hint that Walden learned of plaintiffs' ties to Las Vegas until *after* the seizure was complete. Because there is no allegation that Walden purposefully directed the actions that form the basis of plaintiffs' claim to Nevada, a Nevada district court necessarily lacks personal jurisdiction over Walden. That should be the end of the matter.[3]

---

[3]Indeed, the majority concedes that the complaint does not allege that Walden knew of plaintiffs' Nevada residency when he seized the $97,000. *See* maj. op. at 17211-12.

### III

But it is not, because the majority shows more creativity construing the complaint than Fiore and Gipson did drafting it. That is, the plaintiffs allege one simple claim: a violation of their Fourth Amendment rights to be free of unreasonable searches and seizures. The gravamen of Fiore and Gipson's complaint is that "[t]he search and withholding of [their] checked baggage . . . was without probable cause, unreasonable, and also constituted an illegal search and seizure by the defendants." Or, as they later put it, "Defendants' actions constitute a violation of U.S. Const. Amd. IV in the unreasonable seizure and unreasonable continued seizure of the plaintiff's funds."

The majority, however, purports to flush out a second claim roosting amidst the lines of the complaint. According to the majority, there is a "false affidavit/forfeiture proceeding aspect of [the] case," maj. op. at 17206, which gives rise to "an allegation that Walden attempted to *defraud* Fiore and Gipson of the seized funds," maj. op. at 17215 (emphasis added). Because, the majority explains, at the time Walden prepared the false probable cause affidavit, he knew plaintiffs had significant connections with Nevada, the district court erred in not asserting personal jurisdiction over Walden based on this false affidavit "aspect" of the case. Maj. op. at 17215-16.

The majority's analysis completely misses the mark for a crucial reason: the complaint did not include a fraud claim. We analyze personal jurisdiction on a claim-by-claim basis. *See, e.g.*, *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 09-56528, ___ F.3d ___, 2011 WL 3437040, at *7 (9th Cir. Aug. 8, 2011) (focusing the jurisdictional inquiry on plaintiff's state law misappropriation claim); *see also Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001) (stating that a district court's specific personal jurisdiction "is claim specific," meaning that personal jurisdiction over one defendant as to a

particular claim does not necessarily give the court personal jurisdiction over that same defendant as to the plaintiff's other claims). The only claim in this complaint is a Fourth Amendment claim for seizure of property. There is no claim that Walden's preparation of the allegedly fraudulent affidavit violated plaintiffs' Fourth Amendment rights,[4] and it is doubtful that such a constitutional tort even exists.

Nor did the plaintiffs bring a state fraud claim. In fact, the plaintiffs do not appear to bring any state claim at all: they claimed federal jurisdiction based on the general federal question statute (28 U.S.C. § 1331) and 28 U.S.C. § 1356,[5] and do not invoke diversity jurisdiction. For that matter, the complaint does not allege over $75,000 in controversy as required for diversity jurisdiction, *see* 28 U.S.C. § 1332(a), or facts from which it is "facially apparent" that the "jurisdictional amount is in controversy," *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 377 (9th Cir. 1997) (internal quotation omitted). Nor does the complaint invoke supplemental jurisdiction.

Indeed, it is doubtful that the elements of a state law fraud cause of action are even lurking in the complaint. Under Nevada law, the elements of a fraud cause of action are (1) a false representation by defendant; (2) defendant's knowledge or belief that the representation was false; (3) defendant's intent that plaintiff act or refrain from acting in reliance upon the misrepresentation; (4) plaintiff's justifiable reliance upon

---

[4]One combs through the complaint in vain to find any argument that the creation of a false probable cause affidavit is a separate constitutional tort. Rather, the plaintiffs point to the false affidavit to support their Fourth Amendment claim, stating that "[t]he law is clearly established that falsifying evidence on an affidavit in support of a seizure or a search renders the seizure or search unconstitutional."

[5]28 U.S.C. § 1356 provides: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of any seizure under any law of the United States on land or upon waters not within admiralty and maritime jurisdiction . . . ."

it; and (5) damage to plaintiff as a result. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1155 (9th Cir. 2005). The complaint does not, however, allege that Walden intended plaintiffs to act or refrain from acting in reliance on the false affidavit, or that plaintiffs justifiably relied on the affidavit.

In any event, an unarticulated state law claim could not give the majority a basis for reversing the district court. When the district court, which had original jurisdiction only over the Fourth Amendment claim, dismissed that claim for lack of personal jurisdiction, it was well within its discretion to decline to exercise supplemental jurisdiction over any implicitly lurking state law claim. *See* 28 U.S.C. § 1367(c)(3); *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002) (district court's decision to decline supplemental jurisdiction reviewed for abuse of discretion).

Because plaintiffs based their claim on Walden's seizure of the cash (which not even the majority contends was purposefully directed toward Nevada) and did not, as the majority suggests, allege a fraud claim, it is impossible to say that plaintiffs' *claim* arose out of or related to Walden's conduct in preparing the allegedly false probable cause affidavit. *See Schwarzenegger*, 374 F.3d at 802.

IV

The majority's reasoning threatens a substantial expansion of the scope of personal jurisdiction. If a district court commits reversible error by failing to give due weight to the "false affidavit/forfeiture proceeding *aspect*" of a complaint, maj. op. at 17206 (emphasis added), even where the parties never asked the court to do so, district courts must scour complaints to find some allegation of wrongful action that might have occurred after the defendant became aware of the plaintiff's residence. Such a ruling essentially requires courts to assert personal jurisdiction over any defendant who learns about the home state of the plaintiff at any time *after* the defendant

engaged in the conduct that formed the basis of plaintiff's claim. To ensure this result, plaintiffs need only assert that the defendant knew their home state and subsequently engaged in some wrongful act.

Obviously, this loosens the due process protection afforded defendants beyond anything allowed by the Supreme Court, which recently reemphasized that personal jurisdiction is not an outmoded legal fiction, but remains a vital part of due process and fair play. *See J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011) (striking down the New Jersey Supreme Court's broad ruling that a state court had personal jurisdiction over a company despite the defendant's lack of minimum contacts with the state.) As the plurality noted, "[f]reeform notions of fundamental fairness divorced from traditional practice" do not give a state lawful judicial authority over a defendant, *id.* at 2787; *see also id.* at 2791 (Breyer, J., concurring in the judgment) (rejecting the state court's adoption of "a broad understanding of the scope of personal jurisdiction based on its view that '[t]he increasingly fast-paced globalization of the world economy has removed national borders as barriers to trade' " (alteration in original) (quoting 987 A.2d 575, 577 (N.J. 2010)).

The majority's decision today unwisely broadens the scope of personal jurisdiction, erroneously rejects the district court's adherence to "traditional practice" in favor of its own "[f]reeform notions" of fairness, *id.* at 2787 (plurality opinion), and holds that Walden is subject to the jurisdiction of a Nevada court despite his having no contacts whatsoever to that state in connection with plaintiffs' Fourth Amendment claim. Because "those who live or operate primarily outside a State have a due process right not to be subjected to judgment in its courts as a general matter," *id.*, I dissent.